UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE RICHARD W. GOLDBERG, JUDGE

| | |
|---|---|
| CP KELCO US, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>NEIMENGGU FUFENG BIOTECHNOLOGIES )<br>CO., LTD., and )<br>SHANDONG FUFENG FERMENTATION, )<br>CO., LTD., )<br><br>Defendant-Intervenors. )<br>)  | **NON-CONFIDENTIAL VERSION**<br><br>Consol. Court No. 13-00288<br><br>Confidential Business Proprietary<br>Information Deleted from Pages<br>2-4, 13-19 and from Attachment 1 |

**PLAINTIFF'S RULE 56.2 REPLY BRIEF FOR JUDGMENT UPON THE
AGENCY RECORD**

Matthew L. Kanna
Nancy A. Noonan
Tina Termei

Arent Fox LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8435

*Counsel for Plaintiff*

Dated: October 3, 2014

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................................1

II.   ARGUMENT...........................................................................................................1

     A.    Defendant Has Failed to Support With Substantial Evidence on the Record
           Its FOP Calculation for the Neimenggu Fufeng Facility .....................................1

     B.    Commerce's Decision to Assign a Zero Value to *X. Campestris* is Not
           Supported by Substantial Record Evidence and is Not Otherwise in
           Accordance with Law ........................................................................................4

           1.   Commerce Did Not Value the *X. Campestris* Bacteria Used to
                Produce Subject Merchandise When it Accounted for the Costs of
                Physically Storing the Bacteria .................................................................5

           2.   How Often A Material Input is Purchased is Irrelevant to Whether
                the Material Input has Value......................................................................7

           3.   The Ability of *X. Campestris* to Self-replicate Does Not
                Simultaneously Render it Valueless as a Material Input and
                Valueless as an Asset ................................................................................8

           4.   Substantial Record Evidence Demonstrates that the *X. Campestris*
                Used to Produce Subject Merchandise Was Licensed, Not
                Purchased ...............................................................................................11

     C.    Commerce's Decision to Directly Value Fufeng's Corn Input, Instead of
           the Intermediate Input of Cornstarch Milk, is Unsupported by Substantial
           Evidence............................................................................................................12

     D.    Commerce Unreasonably Valued Fufeng's Corn by Classifying it as "Fit
           for Animal Feed" ..............................................................................................16

           1.   Commerce Failed to Provide Reasoning or Substantial Record
                Evidence to Support its Corn Valuation ..................................................17

           2.   By Not Averaging Import Values For All Thai HTS Subheadings
                Covering Fufeng's Corn Inputs, Commerce Impermissibly
                Departed From Prior Agency Practice.....................................................19

           3.   Defendant Fundamentally Misunderstands the Nature of Surrogate
                Value Selection Under NME Methodology...............................................20

III.  CONCLUSION......................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Bausch & Lomb, Inc. v. United States,
    148 F.3d 1363, 1365-66 (Fed.Cir. 1998) ...........................................................................18

Carl Zeiss, Inc. v. United States,
    195 F.3d 1375, 1378 (Fed.Cir. 1999)................................................................................18

Faus Group, Inc. v. United States,
    581 F.3d 1369, 1371-72 (Fed. Cir. 2009) ...................................................................17, 18

Home Products Int'l, Inc. v. United States,
    32 C.I.T. 337, 556 F.Supp.2d 1338 (2008) .......................................................................17

Rhone Poulenc, Inc. v. United States,
    899 F.2d 1185 (Fed.Cir. 1990)............................................................................................3

Taian Ziyang Food Co. v. United States,
    33 C.I.T. 828, 637 F.Supp.2d 1093 (2009) ......................................................................12

Union Camp Corp. v. United States,
    22 C.I.T. 267, 8 F.Supp.2d 842 (1998) .............................................................................10

STATUTES

19 U.S.C. § 1677b(c) ...............................................................................................................20, 21

19 U.S.C. § 1677b(c)(1)(B) ...................................................................................................4, 7, 8

OTHER AUTHORITIES

Diamond Sawblades and Parts Thereof from the People's Republic of China, 79 Fed.
    Reg. 35723 (Dept. of Commerce June 24, 2014), and accomplishing Issues &
    Decision Memorandum........................................................................................................20

Multilayered Wood Flooring from the People's Republic of China, 76 Fed. Reg. 64,318
    (Dept. of Commerce Oct. 18, 2011), and accomplishing Issues & Decision
    Memorandum.......................................................................................................................20

Seamless Refined Copper Pipe and Tube from the People's Republic of China, 75 Fed.
    Reg. 60725 (Dep't of Commerce Oct. 1, 2010) (final determ.)............................................5

Xanthan Gum from the People's Republic of China, 78 Fed. Reg. 33351 (Dep't of
    Commerce June 4, 2013) (final determ.), and accomplishing Issues & Decision
    Memorandum .............................................................................................................. passim

Xanthan Gum from the People's Republic of China, 78 Fed. Reg. 43143 (Dep't of
    Commerce July 19, 2013) (amended final determ.) ...................................................................1

## I.    INTRODUCTION

Plaintiff CP Kelco US, Inc. ("CP Kelco") hereby submits its reply in support of its

motion for judgment upon the agency record in which it challenged the U.S. Department of

Commerce's ("Commerce") final determination in the investigation of xanthan gum from the

People's Republic of China for the period of investigation October 1, 2011 through March 31,

2012.  Commerce's final determination was published in the Federal Register in <u>Xanthan Gum</u>

<u>from the People's Republic of China</u>, 78 Fed. Reg. 33351 (Dep't of Commerce June 4, 2013)

(final determ.), P.R. 3138663,[1] as amended, 78 Fed. Reg. 43143 (July 19, 2013), P.R. 3146513

("<u>Final Determination"</u> and "<u>Final Amended Determination</u>," respectively). In its Motion for

Judgment Upon the Agency Record, Plaintiff challenged Commerce's determination and

requested the Court to: (1) recalculate Neimenggu Fufeng Biotechnologies, Co., Ltd.'s energy

consumption; (2) assign a surrogate value to the bacterial strains of *Xanthomonas campestris* of

both Neimenggu Fufeng Biotechnologies, Co., Ltd. and Deosen Biochemical Ltd.; (3) value

Neimenggu Fufeng Biotechnologies, Co., Ltd's intermediate product, cornstarch milk; and (4) in

the alternative, to revalue Neimenggu Fufeng Biotechnologies, Co., Ltd.'s corn. <u>See</u> Plaintiff's

Rule 56.2 Motion for Judgment on the Agency Record (March 7, 2014), ECF No. 29 ("Pl. Br.").

## II.    ARGUMENT

### A.    Defendant Has Failed to Support With Substantial Evidence on the Record Its FOP Calculation for the Neimenggu Fufeng Facility

As Plaintiff has already demonstrated, Commerce committed an egregious error when it

---

[1] Public record documents cited in this brief are designated as "P.R." followed by the Commerce Department Bar Code number assigned in the official administrative record list. Confidential record documents are designated as "C.R.," followed by the Commerce Department Bar Code number assigned in the official administrative record list.

**Public Version**

revised the energy allocation for Defendant-Intervenors' Neimenggu Fufeng facility. See Pl. Br.

at 8. This error significantly reduced Defendant-Intervenors' calculated dumping margin. Rather

than request a voluntary remand to correct its mistake, Commerce has doubled-down on its

flawed calculation. The crux of Commerce's error is that it double-counted a large portion of

Neimenggu Fufeng's production of raw xanthan gum and in doing so dramatically inflated the

denominator used in its factors of production ("FOP") calculation for energy. Commerce treated

the further processed xanthan gum from the Shandong Fufeng facility ([       ] MT) as if it had

not already been included in the Neimenggu Fufeng total production. This mistake is made clear

by direct record evidence. Defendant-Intervenors reported, and Commerce officials *verified*, that

Defendant-Intervenors correctly reported total production of raw xanthan gum as [       ] MT.

See Letter from Grunfeld, Desiderio, Lebowitz, Silverman, Klestadt LLP to Hon. Rebecca

Blank, Re: Service of Verification Exhibits for Neimenggu Fufeng Biotechnologies Co., Ltd. at

Ex. 15 at 20 (noting, [

                                                                          ]) and 21 (showing [             ]

KG of total production as the denominator in the FOP calculations for [

                                                              ]) (Jan. 28, 2013), C.R.

3116561, P.R. 3116597 ("Fufeng Verification Exhibits").

     The mistake can also be seen being made in slow-motion in Defendant's response brief as

it tries to explain away the error:

> **All raw xanthan gum was produced at Neimenggu.** Some raw
> xanthan gum (approximately [   ] percent) was further processed
> into xanthan gum and then sold directly from the Neimenggu
> Fufeng facility, **while other raw xanthan gum (approximately
> [   ] percent) was sold to Shandong Fufeng for milling,
> packing, and sale. Therefore, because all subject merchandise
> was produced to some degree at the Neimenggu Fufeng facility,
> but some was further processed and sold from the Shandong**

*Public Version*

> **Fufeng facility, Commerce reasonably allocated the energy used to all subject merchandise, whether it was ultimately sold from Neimenggu Fufeng or Shandong Fufeng.**

<u>See</u> Defendant's Response to Plaintiffs' Motion for Judgment on the Agency Record at 30-31 (July 9, 2014), ECF No. 43 ("Def. Br.") (citations omitted). Commerce's error tremendously overstates the production denominator used to calculate the energy consumed in the production of subject merchandise at Neimenggu Fufeng, thus significantly reducing the accuracy of Defendant-Intervenors' dumping margin.

Correcting this error would not lead to, as asserted by Defendant, "an entire pool of subject merchandise that was produced at Neimenggu Fufeng would not include the costs of energy that went into producing that merchandise, thereby distorting the reported production." <u>See</u> Def. Br. at 31. On the contrary, it would remedy a significant calculation error and increase the accuracy of Commerce's dumping calculation. <u>See</u> <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed.Cir. 1990).

The exact location of Commerce's calculation error is in Attachment 3 of Fufeng Final Analysis Memo reporting "POI Total Xanthan Gum Production Quantity." <u>See</u> Memorandum from B. Farlander to the File, Re: Final Determination Analysis Memorandum for Neimenggu Fufeng Biotechnologies Co., Ltd. (aka Inner Mongolia Fufeng Biotechnologies Co., Ltd. & Shangdong Fufeng Fermentation Co., Ltd.) at Attachment 3 (May 28, 2013), C.R. 3137732, P.R. 3137734 ("Fufeng Final Analysis Memo."). Commerce incorrectly used [          ] KG, as demonstrated above, but based on verified record evidence it should have used [          ] KG. There is a record citation ("Sources") in the same Attachment 3 allegedly supporting the use of [          ] KG. <u>Id.</u> However, reviewing that evidence reveals the correct number, as submitted by Defendant-Intervenors themselves, for use as the denominator in the energy allocation is [          ] MT. <u>See</u> Letter from Grunfeld, Desiderio, Lebowitz, Silverman, Klestadt LLP to

3

*Public Version*

Hon. Rebecca Blank, Re: Section D Response for Neimenggu Fufeng Biotechnologies Co., Ltd. at Ex. D-7 (Sept. 27, 2012), C.R. 3099058, P.R. 3099060 ("Fufeng Section D Response") (showing [

]).

In addition, as verified, Commerce used [          ] MT of total raw xanthan gum produced as the denominator for every other FOP calculation at Neimenggu Fufeng (except for

[                                                                              ]). See

Fufeng Verification Exhibits at Ex. 15 at 21 (showing [          ] KG of total production as the denominator in FOP calculations). If the Court remands this error to Commerce for reconsideration, Plaintiff respectfully requests the Court instruct Commerce to reconsider whether it has made an error in its calculation, and if not, then to explain why no other FOP consumed in the production of raw xanthan gum uses the [          ] production denominator that Commerce has insisted is correct in Neimenggu Fufeng's energy FOP calculation.

**B.    Commerce's Decision to Assign a Zero Value to *X. Campestris* is Not Supported by Substantial Record Evidence and is Not Otherwise in Accordance with Law**

Defendant and Defendant-Intervenors fail to address Plaintiff's argument that production strains of *X. campestris* must be valued as directed by statute. See Pl. Br. at 12-17. When using the NME methodology, the statute instructs Commerce to "determine the normal value of the subject merchandise on the basis of the *value* of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1)(B) (emphasis added). In its response brief, Fufeng reminds the Court "in furtherance of its obligation to calculate dumping margins as accurately as possible, the Department should attempt to determine what the respondent's production costs would be if determined by market forces." See Fufeng's Response Brief in Opposition to CP

4

Kelco's Rule 56.2 Motion for Judgment on the Agency Record at 10 (July 9, 2014), ECF No. 41

("Def. Intv. Br.") (citations omitted). Fufeng further notes "this court {sic} has held that it is

appropriate for the Department not to assign a surrogate value to a factor of production (such as

irrigation water) if the respondent would not incur a cost for purchasing that factor in a market

economy environment." See Def. Intv. Br. at 10 (citations omitted). Plaintiff fully agrees with

this standard, but submits that the value of the *X. campestris* is not akin to irrigation water and

therefore a surrogate value must be assigned.

Defendant and Defendant-Intervenors focus almost exclusively on three issues in their

responses, none of which are relevant to the question of whether *X. campestris* should be valued:

(1) whether the *costs* associated with physically storing (not *acquiring*) production strains of *X.*

*campestris* were captured in the application of surrogate financial ratios; (2) the timing and

frequency of payments made by respondents when they acquired their production strains of *X.*

*campestris*; and (3) the inherent property of *X. campestris* bacteria to self-regenerate. Def. Br. at

9-14; Def. Intv. Br. at 6-20 None of these issues address the question before the Court: whether

Commerce erred in assigning a zero value to the *X. campestris* bacteria consumed in the

production of subject merchandise.

> **1.    Commerce Did Not Value the *X. Campestris* Bacteria Used to Produce
>         Subject Merchandise When it Accounted for the Costs of Physically
>         Storing the Bacteria**

Defendant and Defendant-Intervenors take issue with Plaintiff's reliance on Seamless

Refined Copper Pipe and Tube from the People's Republic of China, 75 Fed. Reg. 60725 (Dep't

of Commerce Oct. 1, 2010) (final determ.), which Plaintiff cited in support of treating *X.*

*campestris* bacteria as a direct material input in the production of subject merchandise.

> … CP Kelco ignores the absence in *Copper Pipe and Tube* of any
> evidence that the solvents at issue were already accounted for in

> the surrogate financial ratios, which, as Commerce noted, made it possible to value the solvent separately without 'double-counting.' Here, by contrast, Commerce found that the costs of using *x. campestris* are already captured in the surrogate financial ratios.

Def. Br. at 13 (citations omitted); see Def. Intv. Br. at 9.

This both mischaracterizes Plaintiff's position and reliance on *Copper Pipe and Tube*. The value of *X. campestris* consumed in the production of subject merchandise was not captured in the surrogate financial ratios used by Commerce, only the cost of *storing* the bacteria was captured. See I&D Memo at 35. The cost of storing a material input and the cost of acquiring that material input are two distinct concepts.

Plaintiff has consistently argued before Commerce that storage and maintenance costs are irrelevant to the question of valuing the *X. campestris* bacteria itself:

> … while Ajinomoto (Thailand) {the source for surrogate financial ratios} may incur costs associated with storing or maintaining cultures of *C. glutamicum* {the bacteria used to produce comparable merchandise}, those costs are irrelevant to the exercise of valuing the *C. glutamicum* organisms. The value of the bacteria used in production, whether it be *C. glutamicum* or *X. campestris*, is what must {be} added to normal value—not the cost associated with maintenance or storage.

See Letter from Arent Fox LLP to Hon. Rebecca Blank, Re: Petitioner's Case Brief at 43 (Mar. 12, 2013), C.R. 3123914, P.R. 3123917 ("Petitioner's Case Br."). Plaintiff further explained to Commerce that the value of the *X. campestris* bacteria was not accounted for in the surrogate financial ratios:

> {i}f Ajinomoto (Thailand) did hold any intellectual property rights, it would have to amortize them as intangible assets according to Thai GAAP, as they amortize their computer software and golf club membership. In short, all relevant record evidence indicates that Ajinomoto (Thailand)'s OH and SG&A ratios do not contain an expense related to the price that Ajinomoto (Thailand) pays for its cultures of the *C. glutamicum* production strain that it uses to produce comparable merchandise.

See Petitioner's Case Br. at 43. Moreover, it is not possible that Ajinomoto (Thailand) owned the

strain of bacteria it used to produce comparable merchandise because its parent company,

Ajinomoto Group (located in Japan), holds the ownership. See Petitioner's Case Br. at 42-43.

Because of this, there can be no "double-counting" if Commerce assigns a surrogate value to the

*X. campestris* consumed in the production of subject merchandise. Commerce acknowledged this

evidence, but disagreed with Plaintiff's suggestion as to what constituted the best information

available to value the *X. campestris*:

> "Regarding Petitioner's argument that the financial statements of
> Ajinimoto {Thailand} do not contain research and development or
> amortization expenses, we disagree with Petitioner that this is a
> valid reason to value the *x. campestris* {sic} bacteria in the manner
> suggested by Petitioner.

See Final Determination, and accompanying Issues and Decision Memorandum at 37 (May 28,

2013), P.R. 3137777 ("I&D Memo"). Commerce's statement makes clear that the disagreement

is *how* to value the *X. campestris* bacteria, not that the actual value was already being captured in

the surrogate financial ratios.

Plaintiff is unaware of any other NME proceeding in which Commerce has determined

that because it has accounted for the cost associated with the *storage* of a material input, it

therefore does not have to value that same input when it is consumed in the production of subject

merchandise as directed by statute. 19 U.S.C. § 1677b(c)(1)(B). To the contrary, the statute does

not exclude material inputs from the valuation exercise if Commerce captures the costs

associated with storing those inputs prior to their consumption in producing subject merchandise.

### 2.    How Often A Material Input is Purchased is Irrelevant to Whether the Material Input has Value

Defendant and Defendant-Intervenors rely heavily on the fact that respondents purchased

their production strains of *X. campestris* prior to the POI, and has not had to pay subsequent fees.

See Def. Br. at 9-10; see also Def. Intv. Br. at 10-11, 13-14. Defendant sums its own position

succinctly: "It {*X. campestris*} can be purchased once and then used, at minimal cost,

thereafter." See Def. Br at 12 (citations omitted). Defendant's position is remarkable as it fails to

state why this is also not applicable for myriad material inputs. Defendant posits that surrogate

values are no longer assigned based on whether they are *consumed* in the production of subject

merchandise, but rather based on when, and how many times, those material inputs are

*purchased*. Commerce did not take such an approach to any other surrogate value on the record,

and it failed to explain why this consideration is unique only to the *X. campestris* consumed in

the production of subject merchandise. Any producer of subject merchandise may have

purchased material inputs prior to the initiation of an antidumping investigation, even in volumes

that could supply their production needs for years, or decades, into the future. That would not

make those material inputs valueless under the statute, which instructs Commerce to "the value

of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1)(B).

Defendant cites nothing that supports this dramatic shift in NME antidumping

methodology. We respectfully request the Court reject this approach as unsupported by

substantial record evidence and otherwise not in accordance with law, and instruct Commerce to

value the material inputs consumed during the POI in the production of subject merchandise,

which includes *X. campestris* bacteria, as directed by 19 U.S.C. § 1677b(c)(1)(B).

> **3.    The Ability of *X. Campestris* to Self-replicate Does Not Simultaneously
>         Render it Valueless as a Material Input and Valueless as an Asset**

Substantial record evidence demonstrates that *X. campestris* bacteria hold a significant

value far beyond storage costs. As Plaintiff explained in the underlying investigation, wild-type

strains of *X. campestris* bacteria do exist, but they are not used in the production environment.

See Petitioner's Case Br. at 44. This is supported by the fact that both respondents acquired their

production strains of *X. campestris* through commercial licensing transactions. See I&D Memo at 36. It is further evidenced by Fufeng's actions when it was faced with a defective source pool of *X. campestris* bacteria that would not properly produce subject merchandise. Because there are no markets where Fufeng could easily acquire a new source of *X. campestris* bacteria, Fufeng instead sent agents to acquire a competitor's production strain of *X. campestris* by covertly procuring a sample of that competitor's fermentation broth. See Petitioner's Case Br. at 44-45 (ft. 118). Fufeng was later sued for its actions and forced to pay a substantial amount in damages. Id. Commerce failed to address any of this substantial record evidence when it determined that *X. campestris* had an effective value of zero.

In support of that finding, Commerce's reasoning loitered significantly on the fact that *X. campestris* self-replicates. See Def. Br. at 12; see also Def. Intv. Br. at 11. This seemingly magical property of self-replication appears to have distracted Commerce from its statutory duty to value the material inputs consumed in the production of subject merchandise. However, there is no legal or logical reason to treat *X. campestris* differently than any other material input in a NME context. The following hypothetical illustrates Commerce's conceptual errors in its approach to valuing *X. campestris*. Imagine respondents found magical faucets that provided an endless supply of freshly squeezed orange juice – a morning delight. After quenching their own thirst, they could be generous to both friends and neighbors, and even establish their own juice smoothie outlets. The cost of the orange juice in each smoothie would be zero (other than the nominal cost of cleaning the magic faucet). Respondents' magic faucets would never lose value because the supply of orange juice would be endless. Profits would be huge, and any competitor that had to pay for its orange juice (i.e., everyone) would be crushed. Of course, respondents could only reach this bright future if they had these faucets. A reasonable person, in a market

economy, would expect acquiring a magic faucet that provided an endless supply of free orange juice would cost something. The numerous biotechnology licensing agreements on the record confirm that self-replicating material inputs are not free in a market economy, i.e., you are going to have to pay something for that magic faucet. See Petitioner's Case Br. at 45 (ft. 120).

Under Commerce's methodology, the *X. campestris* bacteria consumed in the production of subject merchandise comes to respondents with a marginal cost equivalent to that of free orange juice, but the source *X. campestris* never loses its value, just like a magic faucet that never runs dry. This approach creates a paradox: Commerce declined to assign a surrogate value to the *X. campestris* consumed in the production of subject merchandise because respondents purchased their *X. campestris* prior to the POI and its self-replicating property makes its cost to respondent minimal. See I&D Memo at 36. Commerce then reasoned this makes *X. campestris* more like an "asset." Id. But when treated as an asset, the ability of *X. campestris* to self-replicate means that its value is never depreciated or amortized, and thus it has no cost beyond the cost of storage. Id. And presto! Commerce reasons that if you have a magic faucet that supplies endless free, freshly squeezed, orange juice that magic faucet has zero value in a market economy. Commerce's reasoning is deeply flawed, unsupported by substantial record evidence, and otherwise not in accordance with law.

Commerce's duty under the statute is to value the *X. campestris* consumed in the production of subject merchandise as if market forces had determined its value. See Union Camp Corp. v. United States, 22 C.I.T. 267, 8 F.Supp.2d 842 (1998) (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 940 (1992)). Commerce needs to extricate itself from its faux valuation paradox. Commerce's reasoning is unreasonable and unsupported by substantial evidence.

10

4.     **Substantial Record Evidence Demonstrates that the *X. Campestris*
Used to Produce Subject Merchandise Was Licensed, Not Purchased**

Plaintiff does not believe whether respondents own or license their production strands of

*X. campestris* has any legal relevance to the question of valuing the *X. campestris* material input.

However, Defendant-Intervenors insists it "owns" its strain of *X. campestris*, and asserts that

Commerce agrees. See Def. Intv. Br. at 14. Substantial record evidence indicates that Fufeng

holds a license to propagate the *X. campestris* bacteria and use it in the production of subject

merchandise, nothing more, as detailed below.

Fufeng was unable to locate the technology transfer agreement that covered its

acquisition of *X. campestris* from Shandong Food Fermentation Industry Research & Design

Institute ("the Institute"). In place of that agreement, Fufeng submitted an article describing in

detail the facts surrounding the Institute's licensing of *X. campestris* and production technology

to a competitor, Jinsu Company ("Jinsu"). After licensing its technology to Jinsu, the Institute

subsequently licensed the same technology to Fufeng. See Letter from Grunfeld, Desiderio,

Lebowitz, Silverman, Klestadt LLP to Hon. Rebecca Blank, Re: Second Supplemental Section D

Response for Neimenggu Fufeng Biotechnologies Co., Ltd. at Ex. 2A (Dec. 18, 2012), C.R.

3111126, P.R. 3111217 ("Fufeng Second Supp. Sec. D Response"). The fact that the technology

transfer to both companies was a licensing of intellectual property, and not an actual sale of

intellectual property, is made clear from the article's statement that after transferring the

technology to Jinsu, the Institute was prohibited from "authorizing others to use the technology

in eastern China" within four years of the contract. Id.  If the Institute was prohibited for a period

of time from authorizing others to use the bacteria and production technology, then the Institute

must have retained intellectual property rights to both. If Jinsu had bought the bacteria and

production technology know-how, then the Institute would have had no rights to authorize any

11

other parties to use either. The article goes on to state that Fufeng acquired its *X. campestris* and

production technology under the same type of "transfer" as Jinsu. Id. ("… in May 2002, Fufeng

company got the same xanthan gum production technology and relevant documents transferred

to it from the Institute for the consideration of 1,000,000 RMB…").

The substantial record evidence detailed above is uncontested by either respondents or

Commerce. It demonstrates conclusively that Fufeng does not "own" its strain of *X. campestris*.

**C.     Commerce's Decision to Directly Value Fufeng's Corn Input, Instead of the Intermediate Input of Cornstarch Milk, is Unsupported by Substantial Evidence**

Commerce's decision to value corn instead of the intermediate input of cornstarch milk is

not supported by substantial evidence on the record. Plaintiff agrees with Commerce's

explanation that Commerce will value the intermediate input "{w}hen there are significant costs

associated with that additional processing," see Def. Br. at 21-22, because "valuing only the

factors of production would not capture the additional capital costs in the normal value

calculation. In contrast, valuing the intermediate input would capture the additional

manufacturing costs incurred to produce the intermediate input." See Def. Br. at 22. Plaintiff

disagrees with Commerce's assertion that valuing the factor of production of corn instead of the

intermediate input of cornstarch milk "more accurately reflects the costs incurred during

Fufeng's production process." See Def. Br. at 20.

This Court has explained that the statutory scheme requires Commerce to:

> calculate{} normal value by isolating each factor of production in
> the production process in the NME country and assigning to it a
> value from a surrogate market economy country…using the "best
> available information." *See* 19 U.S.C. § 1677b(c)(1)…  In essence,
> Commerce creates a "hypothetical" market value to approximate
> the production experience in the NME country.

See Taian Ziyang Food Co. v. United States, 33 C.I.T. 828, 637 F.Supp.2d 1093 (2009).  The

evidence on the record described below and in Plaintiff's initial submission to the Court supports

the conclusion that on this record, the intermediate input of cornstarch milk should be valued

instead of corn. This is because the additional processing (including equipment, labor, and

energy) required to make cornstarch milk from corn has significant costs associated with that

processing, because a wet-milling facility (called a starch-making workshop by Fufeng) is

required.

Commerce's verification report summarizes the process used to produce cornstarch milk

from corn, and the only reasonable conclusion is that that process requires significant additional

manufacturing costs to produce cornstarch milk from corn.  As explained in the verification

report:

- Fufeng has a starch-making workshop;
- Corn kernels must be off-loaded from trucks;
- Corn silos are used to store corn kernels;
- Corn is processed in [                    ];
- Corn is processed in [                    ];
- Corn is processed in [            ] workshop;
- Corn protein powder by-product is then packed into 40-kg bags; and
- Pipes were installed and are used to transport "refined starch milk from the starch-making workshop to the xanthan gum making workshop."

See Memorandum from Patrick O'Connor to the File, Re: Verification of the Sales and Factors

Responses of Neimenggu Fufeng Biotechnologies Co. Ltd. and its affiliate Shandong Fufeng

Fermentation Co., Ltd. at 14 (Feb. 20, 2013) C.R. 3120112, P.R. 3120113 ("Fufeng Verification

Report") .

The significance of the production of cornstarch milk from corn is also evident in

Fufeng's Section D Response. In that Response, Fufeng explained that the starch-making

workshop is one of only three workshops within Neimenggu Fufeng that is involved in the

production of merchandise under consideration. See Fufeng Section D Response at 14. A review

13

Public Version

of the production process described by Fufeng also shows that the starch-making stage is

significant, even as compared to the xanthan gum making stage. Below is an excerpt from

Fufeng's Section D Response describing these two stages of production in Neimenggu Fufeng:

Starch Making Stage:

[

]

Xanthan Gum Production Stage:

[

].

See Fufeng Section D Response at 5-6.

Fufeng's Section D response also explains that [                    ] is one of the three main

cost centers for tracing the consumption of subject merchandise. See Fufeng Section D Response

at 14. The production flowchart provided by Fufeng explains the various processes involved in

the production of cornstarch milk and xanthan gum as follows:

Tab 3 "starch production flowchart"
[                                                                                          ]

Xanthan gum production flow chart

14

[

]$^2$

[   ] pieces of equipment are described for the starch production flowchart while [   ] pieces of equipment are described for the xanthan gum production flow chart.

Finally, although labor is its own factor of production, the amount of labor used in each process is evidence of the significance of that process. At verification, Fufeng presented a minor correction that the total labor consumption used in the starch-making workshop, including overtime, was to [   ] hours. See Fufeng Verification Report at 2. Verification Exhibit 16 shows that the direct labor consumed in the xanthan gum making stage was [   ]. As such, the labor hours used in the starch making process is more than [   ] percent of the hours of labor used in the xanthan gum process. See Fufeng Verification Exhibits at Ex. 16.

Accordingly, Plaintiff disagrees with Commerce's position that the evidence on the record does not contain any "evidence to demonstrate that such 'significant' costs {that is, overhead costs from Fufeng's wet-milling operations} exist." See Def. Br. at 22. To the contrary, the production process for starch-making as compared to xanthan gum making, pieces of equipment described by Fufeng for each process, and the amount of labor used for each process, all of which were verified by Commerce, can only be viewed as evidence that there are significant costs associated with the production of the intermediate input of cornstarch milk. As such, Commerce's conclusion that "the costs incurred in the starch-making process to turn corn into cornstarch milk are not so significant that the corn factor of production does not properly reflect costs incurred… {and that} The starch-making facility is not a significant contributor to the overhead costs." Def. Br. at 25, is refuted by the production process for cornstarch milk,

_____
$^2$ Packing process is omitted because packing is not part of the production process.

15

*Public Version*

pieces of equipment used in the production of cornstarch milk, and labor hours.

Plaintiff relies on the Energy Star Report as further evidence that wet-milling facilities require significant energy and capital costs, and therefore it can be inferred that Fufeng's starch-making facility also requires significant energy and capital costs, such that Commerce's intermediate input policy should be used in this proceeding.  Attachment 1 is a worksheet applying Neimenggu Fufeng's revised energy consumption to the Energy Star Report, which shows that Neimenggu Fufeng's total energy consumption if [    ] percent of the total energy consumption show in the report. Commerce's position that the Energy Star Report "is not instructive on how much energy Fufeng should be consuming in its starch-making facility," because the Energy Star Report is "based on a corn wet-milling facility which producers ethanol, sweeteners, and dry cornstarch," and that cornstarch in dry form differs from Fufeng's actual input of cornstarch milk in liquid form, see Def. Br. at 23-24, misses the point that the purpose of the Energy Star Report is to show that production of cornstarch, in any form, from corn, requires significant capital costs. Similarly, Defendant-Intervenors assertion that "starch milk production is a much more basic operation" than the xanthan gum production process is disingenuous in light of the evidence. See Def. Int. Response at 19. As a result, as "best available information available," it would be appropriate for Commerce to value Fufeng's intermediate product, cornstarch milk, rather than corn.

### D.   Commerce Unreasonably Valued Fufeng's Corn by Classifying it as "Fit for Animal Feed"

Commerce's decision to apply a surrogate value to Fufeng's corn inputs based on the Thai HTS subheading for "corn – fit for animal feed" remains unsupported by substantial evidence. Commerce stated it classified Fufeng's corn "based on Fufeng's description of the quality of corn." See Memorandum from B. Farlander to the File, Re: Final Determination

16

Public Version

Analysis Memorandum for Neimenggu Fufeng Biotechnologies Co., Ltd. (aka Inner Mongolia Fufeng Biotechnologies Co., Ltd. & Shangdong Fufeng Fermentation Co., Ltd.) at 8, 10 (May 28, 2013), C.R. 3137732, P.R. 3137734 ("Fufeng Final Analysis Memo"). Fufeng's "description" is that its corn is "[         ]" and the "[

]." See Fufeng Final Analysis Memo at 9.  Notwithstanding Defendant and Defendant-Intervenors' response briefs, it remains entirely unclear how Commerce contemplated this description and then concluded the best information available on the record was import values for corn "fit for animal feed." Substantial evidence on the record and prior agency practice would begin with the description of the material input and would then examine HTS subheadings that match that description. This reasonable approach results in [          ] of Fufeng's corn inputs falling into the Thai HTS subheading "corn -- other," not "corn – fit for animal feed." See Petitioner's Case Br. at 20–23. Commerce provided no information to explain its decision-making "path." It is well settled that an agency's path must be reasonably discernible from the administrative record and that is not the case here. See Home Products Int'l, Inc. v. United States, 32 C.I.T. 337, 556 F.Supp.2d 1338 (2008) (citing Bowman Transp., Inc. v. Arkansas–Best Freight Sys. Inc., 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

### 1. Commerce Failed to Provide Reasoning or Substantial Record Evidence to Support its Corn Valuation

Although the process of selecting a surrogate value in a NME case is not strictly an exercise in tariff classification, the process of proper tariff classification illustrates the absence of reasoning or substantial record evidence underlying Commerce's selection of it surrogate value for Fufeng's corn inputs. A classification decision involves two steps. The first step addresses the proper meaning of the relevant tariff provisions, which is a question of law. See Faus Group, Inc.

v. United States, 581 F.3d 1369, 1371–72 (Fed. Cir. 2009) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)). The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed, which, when disputed, is a question of fact. Id. Putting aside the scintilla of record evidence relied upon by the Department to assess the nature of Fufeng's corn inputs, i.e., the "description" provided by Fufeng, the resolution of the classification issue turns on the first step: *determining the proper meaning and scope of the relevant tariff provisions.* See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 (Fed.Cir.1999); Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365–66 (Fed.Cir.1998). The record and the Defendant and Defendant-Intervenors' briefs show that nothing even slightly similar to this step was taken by Commerce in its Final Determination. In fact, Commerce's *only* consideration in selecting a surrogate value for Fufeng's corn was step two: examining the merchandise/Fufeng's corn. The only reasoning provided by Commerce to justify its selected surrogate value was the repeated statement that it was "*based on Fufeng's description of the quality of corn.*" Fufeng Final Analysis Memo at 8-10; see Def. Br. at 29. Because Commerce failed to provide any description of what might constitute corn "fit for animal feed" or corn "fit for human consumption," no interested party can challenge Commerce's decisions on that ground.

The only evidence on the record that gives meaning to the relevant Thai HTS subheadings is the Thai Agricultural Standard for Maize ("Thai Corn Standard"). See Letter from Arent Fox LLP to Hon. Rebecca Blank Re: Post-Preliminary Surrogate Value Submission at Ex. 10 (Feb. 22, 2013), PR 3120577. When following the specifications of the Thai Corn Standard, the [     ] of Fufeng's corn [     ] to satisfy the requirements of "fit for human consumption" or "fit for animal feed." See Pl. Br. at 25; Petitioner's Case Br. at 20-23. Defendant and

18

Public Version

Defendant-Intervenors unreasonably argue that Commerce could not use the Thai Corn Standard because it is a "voluntary" standard. See Def. Br. at 28; Def. Intv. Br. at 23; Fufeng Final Analysis Memo at 10. Even if the standard is considered voluntary, the metrics it contains for measuring corn quality are *not* voluntary in meaning. It represents the Thai Government's official position on the standards necessary to qualitatively assess corn. It provides definitive meaning to the various grades of corn, regardless of whether one chooses to certify their corn. At no point did Commerce impugn the credibility of the quality metrics contained in the Thai Corn Standard. This means the record contains *one* source of evidence that gives meaning to the Thai subheading descriptions for corn, and its reliability is fully intact.

In its case brief to the agency, Plaintiff performed a complete valuation exercise (which Commerce failed to perform) by combining the quality standards contained in the Thai Corn Standard and the actual corn quality data that Defendant-Intervenors placed on the record. That analysis showed [      ] % of Fufeng's corn most closely matches with the Thai HTS subheading 10.50.90.90090 ("corn – other"). See Petitioner's Case Br. at 20-23 (explains the analysis for determining the cited percentage). Commerce declined to consider using Thai HTS 10.50.90.90090 based on the assertion that it [

                                                                                ]. See Fufeng Final Analysis Memo at 9; Def. Br. at 27. This assertion is transparently false. To the contrary, Commerce knows exactly what is entered under that Thai HTS subheading: corn that is not "fit for human consumption" or "fit for animal feed," *i.e.,* [                         ] corn inputs.

> **2.    By Not Averaging Import Values For All Thai HTS Subheadings Covering Fufeng's Corn Inputs, Commerce Impermissibly Departed From Prior Agency Practice**

In the alternative of valuing all of Fufeng's corn under the Thai subheading "other,"

Commerce should have averaged the average unit values for each of the Thai HTS subheadings that could have described Fufeng's corn inputs. Prior agency practice supports this approach when Commerce has been unable to select a specific HTS subheading among multiple options. See Multilayered Wood Flooring from the People's Republic of China, 76 Fed. Reg. 64,318 (Dept. of Commerce Oct. 18, 2011), and accompanying I&D Memo at Cmt. 20 (Oct. 11, 2011) ("Accordingly, we find the most representative surrogate value on the record to be a simple average of the {average unit value's} provided from Philippine HTS 4411.11 and 4411.21"); Diamond Sawblades and Parts Thereof from the People's Republic of China, 79 Fed. Reg. 35723 (Dept' of Commerce June 24, 2014), and accompanying I&D Memo at Cmt. 10 (June 18, 2014) ("we continue to use the simple average of the GTA statistics for these two HTS codes consistent with Diamond Sawblades 2"). Commerce provided no reasoning or explanation for why it departed from it past practice. This is unreasonable.

### 3. Defendant Fundamentally Misunderstands the Nature of Surrogate Value Selection Under NME Methodology

Defendant misunderstands that assigning a surrogate value involves determining its value in a *surrogate country*. Defendant argues, "CP Kelco failed to demonstrate how the Thai Corn Standard, which provides data from the Thai government regarding Thai corn qualities, should be imposed upon corn from China to determine its quality and categorization." See Def. Br. at 29. We agree that the Thai Corn Standard should not be used to determine the classification of Fufeng's corn under the Chinese HTS. However, NME antidumping cases involve assigning surrogate values to factors of production. See 19 U.S.C. § 1677b(c). A surrogate country has been selected: Thailand. Surrogate values are generated from the surrogate country. The Thai Corn Standard should be used to determine corn classification based on quality metrics in the surrogate country – Thailand – not China.

Similarly, Commerce explained that it could not use the Thai Corn Standard because there is "*no record evidence on what type of corn is required to produce xanthan gum in Thailand*, so the voluntary Thai standards are not determinative and do not support Petitioner's argument of using these standards as a basis for selecting the appropriate SV for Fufeng's corn input." Fufeng Final Analysis Memo at 10. This is nonsensical. Using surrogate values to calculate factors of production does not mean that you reinvent the production-process-wheel and examine how that surrogate country would produce the subject merchandise. The statute dictates determining normal value by calculating the factors of production in the surrogate country. 19 U.S.C. § 1667b(c). It does not change the factors of production based on what would be used if production were to occur in the surrogate country. Commerce's reasoning for rejecting the Thai Corn Standard is again unreasonable.

Finally, Defendant-Intervenors dedicates pages of its response brief arguing issues that are not before the Court. Specifically, Defendant-Intervenors consumes the Court's time explaining U.S. export patterns that are not at issue in this appeal. Def. Intv. Br. at 25-28. In even longer detail, Defendant-Intervenors advances arguments relating to popcorn that are not currently before the Court. Id.  Plaintiff has made clear that Commerce's decision to value Fufeng's corn inputs using a surrogate value derived solely from Thai import data for corn "fit for animal feed" is unsupported by substantial record evidence and not otherwise in accordance with law. Nothing in Defendant-Intervenors' response brief related to corn prices and the importation of "popcorn" informs the issue before the Court.

## III.   CONCLUSION

For the reasons set forth above and in Plaintiff's March 7, 2014 Memorandum of Law in Support of Motion for Judgment on the Agency Record, Plaintiff respectfully requests that this

Court grant Plaintiff's motion for judgment on the administrative record and remand the final

determination back to Commerce, with the following instructions: (1) recalculate Neimenggu

Fufeng Biotechnologies, Co., Ltd.'s energy consumption; (2) assign a surrogate value to the

bacterial strains of *X. campestris*; (3) value Neimenggu Fufeng Biotechnologies, Co., Ltd's

intermediate product, corn-starch milk; and (4) revalue Neimenggu Fufeng Biotechnologies, Co.,

Ltd.'s corn.

<div style="margin-left: 40%;">

Respectfully submitted,

**/s/ Matthew L. Kanna**
Matthew L. Kanna
Nancy A. Noonan
Tina Termei

Arent Fox LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8435

*Counsel for Plaintiff*

</div>

Dated: October 3, 2014

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's Rule 56.2 Reply Brief for Judgment upon the Agency Record complies with the word limitation requirement. The word count for Plaintiff's Reply Brief, as computed by Arent Fox LLP's word processing system is 6,693.

Respectfully submitted,

<u>/s/ **Matthew L. Kanna**</u>
Matthew L. Kanna
Nancy A. Noonan
Tina Termei

Arent Fox LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8435

*Counsel for Plaintiff*

Dated: October 3, 2014

**Attachment 1**

**Wet Milling Process**
**Comparison Of Neimenggu FuFeng's Revised Reported Energy Consumption To Energy Star Report**

**1. Neimenggu FuFeng**

| | | | |
|---|---|---|---|
| Corn consumption in kilograms | [ | ] | *a* |
| Kilograms per bushel | | 25.40 | *b* |
| Corn consumption in bushels | [ | ] | *c = a / b* |
| | | | |
| Electricity consumption in kwh | [ | ] | *d* |
| BTUs/kwh | | 3,412 | *e* |
| Electricity consumption in BTUs | [ | ] | *f = d \* e* |
| Electricity consumption in BTUs per bushel | [ | ] | *g = f / c* |
| | | | |
| Steam consumption in MT | [ | ] | *h* |
| Steam conversion factor in kwh/MT | [ | ] | *i* |
| Steam consumption in kwh | [ | ] | *j = h \* i* |
| BTUs/kwh | | 3,412 | *e* |
| Steam consumption in BTUs | [ | ] | *k = j \* e* |
| Steam consumption in BTUs per bushel | [ | ] | *l = k / c* |

*Source:*
*Letter from Grunfeld, Desiderio, Lebowitz, Silverman, Klestadt LLP to Hon. Rebecca Blank, Re: Section D*
*Response for Neimenggu Fufeng Biotechnologies Co., Ltd. at Ex. D-6  (Sept. 27, 2012), C.R. 3099058, P.R.*
*3099060*
*Memorandum from B. Farlander to the File, Re: Final Determination Analysis Memorandum for Neimenggu*
*Fufeng Biotechnologies Co., Ltd. (aka Inner Mongolia Fufeng Biotechnologies Co., Ltd. & Shangdong Fufeng*
*Fermentation Co., Ltd.) at Attachments 2-3 (May 28, 2013), C.R. 3137732, P.R. 3137734*

**2. Energy Star Report**

| Process | Total Energy Consumption By Energy Type (BTU/bushel) | | | |
|---|---|---|---|---|
| | Electricity | Steam | Combined | |
| Corn receiving | 425 | | 425 | |
| Steeping | 214 | 3,150 | 3,364 | |
| Steepwater evaporation | 525 | 19,513 | 20,038 | |
| Germ recovery (1st grind) | 681 | | 681 | |
| Germ recovery (2nd grind) | 348 | | 348 | |
| Germ recovery (germ washing) | 24 | | 24 | |
| Germ dewatering and drying | 440 | 3,425 | 3,865 | |
| Fiber recovery | 2,156 | | 2,156 | |
| Fiber dewatering | 379 | | 379 | |
| Protein (gluten) recovery | 999 | | 999 | |
| Gluten thickening and drying | 513 | | 513 | |
| Starch washing | 480 | | 480 | |
| Gluten Feed Dryer | 974 | | 974 | |
| Total Energy Star Consumption | 8,158 | 26,088 | 34,246 | *m* |
| Neimenggu Fufeng Energy Consumption | [ | | ] | *n = g , l* |
| **Neimenggu FuFeng Energy Consumption as a % of Energy Star Report** | [ | | ] | *o = n / m* |

*Source:*
*Letter from Arent Fox  LLP to Hon. Rebecca Blank, Re: Comments on Deficiencies in Neimenggu Fufeng Biotechnologies Co., Ltd's*
*Section A, C, and D Questionnaire Responses at Ex. 4 (Oct. 15, 2012), C.R. 3101200, P.R. 3101206*