Slip Op. 15-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| CP KELCO US, INC.,<br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES,<br>　　　　　　　　　　Defendant,<br><br>and<br><br>NEIMENGGU FUFENG<br>BIOTECHNOLOGIES CO., LTD., and<br>SHANDONG FUFENG FERMENTATION,<br>CO., LTD.,<br>　　　　　　　　Defendant-Intervenors. |

Before: Richard W. Goldberg, Senior Judge
Court No. 13-00288

**PUBLIC VERSION**

## OPINION

[The court remands the final determination in an antidumping investigation of xanthan gum from the People's Republic of China.]

Dated:  March 31, 2015

*Nancy A. Noonan* and *Matthew L. Kanna*, Arent Fox LLP, of Washington, DC, argued for plaintiff.  With them on the brief was *Matthew J. Clark*.

*Alexander O. Canizares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, and *L. Misha Preheim*, Senior Trial Counsel.  Of counsel on the brief was *Melissa M. Brewer*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Mark E. Pardo*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for defendant-intervenors Neimenggu Fufeng Biotechnologies Co., Ltd. and Shandong Fufeng Fermentation Co., Ltd.  With him on the brief were *Andrew T. Schutz*, *Dharmendra Choudhary*, and *Kavita Mohan*.

Goldberg, Senior Judge:  CP Kelco US ("Kelco"), Neimenggu Fufeng Biotechnologies,

Co., Ltd., and Shandong Fufeng Fermentation Co., Ltd. (collectively, "Fufeng") challenge the

final determination of the Department of Commerce ("Commerce") in its antidumping

investigation of xanthan gum from the People's Republic of China.  *Xanthan Gum from the*

*People's Republic of China*, 78 Fed. Reg. 33,351 (Dep't Commerce June 4, 2013) (final determ.)

and accompanying Issues & Decision Mem. ("I&D Mem."); *Xanthan Gum from the People's*

*Republic of China*, 78 Fed. Reg. 43,143 (Dep't Commerce July 19, 2013) (am. final determ.); *see*

*also* Final Determination Analysis Mem. for Neimenggu Fufeng Biotechnologies Co., Ltd.

("Fufeng Final Determination Analysis Mem."), PD 432 (May 28, 2013).

Together, Kelco and Fufeng claim that Commerce made several incorrect decisions:  (1)

Commerce's decision to treat the bacterial strain *Xanthomonas Campestris* ("X. Campestris") as

an asset, rather than as a direct material input, (2) Commerce's selection of the Thai Ajinomoto

financial statements over the Thai Fermentation statements for calculating surrogate financial

ratios, (3) Commerce's selection of the *Doing Business 2013: Trading Across Borders* ("*Doing*

*Business 2013*") report over competing data from a website called Dxplace for valuing Fufeng's

truck freight, (4) Commerce's decision to value Fufeng's corn as a direct input, instead of

valuing the cornstarch milk produced therefrom as an intermediate input, (5) Commerce's

decision to value Fufeng's corn as corn imported under the Thai tariff heading for corn "fit for

animal feed," (6) Commerce's decisions, when allocating energy at Fufeng's Neimenggu facility,

(a) to include all of the energy consumed at Neimenggu's cornstarch workshop in the numerator

of Neimenggu's xanthan-gum energy-consumption rate, and (b) to use the full amount of

unfinished xanthan gum produced at Neimenggu as the denominator of Neimenggu's xanthan-

gum energy-consumption rate.  The court remands the second of these decisions for further

explanation.  As for the last two ((6)(a) and (b)), the government has requested voluntary

remand, which the court grants.  The court sustains the agency's reasoning on the remaining four

decisions.

**GENERAL BACKGROUND**

When foreign exporters sell their goods in the United States at less than fair value and to

the detriment of U.S. industry, the U.S. Government imposes duties on those goods.  *See* 19

U.S.C. § 1673 (2006).  These duties are called "antidumping duties."  Antidumping duties are

calculated by subtracting the foreign product's "export price," or the product's price in the

United States, from its "normal value" ("NV"), or the product's price in the exporting country.

*See id.*

Commerce's method for calculating the NV of goods depends on whether the goods

come from a country with a market economy ("ME") or from a country with a nonmarket

economy ("NME").  For market-economy goods, Commerce generally uses the goods' price in

the exporting country as NV.  *See id.* § 1677b(a)(1)(B)(i).  For NME exports, however, the

export-country price cannot be used:  The law presumes that government intervention distorts

prices in the home market.  *See Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT

__, __, 949 F. Supp. 2d 1311, 1317 (2013).  Nor can Commerce calculate the NV of NME

exports by adding the cost of the resources used to make those goods (called "inputs"), because

input costs may be just as distorted as the final costs of the goods.  *See id.*  To calculate NV for

goods made in NME countries, then, Commerce assigns each of the goods' direct material inputs

an artificial market price or surrogate value.  *See* 19 U.S.C. § 1677b(c)(1).  Commerce selects

sources for artificial market prices based on which ones provide the "best available information."

The prices generally come from a market-economy country that Commerce has selected because

it produces significant amounts of subject or similar merchandise and is economically

comparable to the NME country.  19 C.F.R. § 351.408(c)(2).  Commerce then totals the

surrogate cost of the inputs used, and adds to this total input cost an amount intended to capture

any noninput costs of production, such as factory overhead, selling, general, and administrative

expenses ("SG&A"), and profit.  *Id.* § 1677b(c)(1); 19 CFR § 351.408(c)(4).  These noninput

costs are added through the application of a series of ratios known as the "surrogate financial

ratios."  The ratios, like inputs, are selected from sources deemed to provide the "best available

information."  *See* 19 U.S.C. § 1677b(c)(1).

In the investigation underlying this case, Commerce sought to determine the appropriate

antidumping duty to impose upon Chinese xanthan-gum manufacturers, including Fufeng.  In a

preliminary determination, Commerce chose Thailand as the surrogate country from to draw

input values, and reached several tentative conclusions about the proper antidumping duty to

impose on Chinese exporters.  Prelim. Surrogate Value Determination, PD 306 (Jan. 9, 2013);

Prelim. Surrogate Country Determination, PD 307 (Jan. 9, 2013).  Kelco and Fufeng contested

Commerce's initial conclusions, and Commerce revised some of them in its final determination.

Kelco and Fufeng filed separate suit, each challenging Commerce's final-determination

conclusions on various grounds.  *See* Order, ECF No. 23.  The court consolidated the cases into

one action.  *Id.*

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction to hear this appeal under 28 U.S.C. § 1581(c).  The court will

uphold the agency's decisions unless those decisions are "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## <u>DISCUSSION</u>

In light of these standards, the court remands three decisions to Commerce.  First, the

court remands Commerce's selection of the Thai Ajinomoto financial statements over the Thai

Fermentation statements for calculating surrogate financial ratios.  Commerce has also requested

remand as to two other decisions, both having to do with the allocation of energy at Fufeng's

Neimenggu facility.  The court remands both per Commerce's request, and sustains the agency

as to all other decisions.

I.      **Commerce's Decision to Treat Bacterial Strain X. Campestris as an Asset
        Rather than a Direct Material Input Is Supported by Substantial Evidence and
        Otherwise in Accordance with Law**

Commerce treated the bacterial strain X. Campestris as an asset accounted for in the

surrogate financial ratios, rather than as a direct material input.  Kelco challenges Commerce's

approach.  Kelco makes three claims: (1) the decision did not attune to statute, (2) the decision

was unsupported by substantial evidence, and (3) the decision was out of accord with past

agency practice.  Pl. CP Kelco US, Inc.'s Mem. of Law in Support of R. 56.2 Mot. for J. on

Agency R. 11–18, ECF No. 29 ("Pl. Kelco's Br.").  All three of Kelco's claims fail.

A.      **Background**

Before recounting the reasons that Commerce gave for treating X. Campestris as an asset

to be compensated for in the surrogate financial ratios, it is first helpful to outline the purpose of

the surrogate financial ratios and how assets are accounted for therein.  Commerce uses surrogate

financial ratios to account for those production inputs that cannot be wholly attributed to a finite

batch of subject merchandise.  For example, a honey factory's jars and corks might not be wholly

attributable to subject honey produced at the factory, if the factory also makes use of the jars and

corks when producing other goods.  *See Shanghai Eswell Enter. Co. v. United States*, 32 CIT

1233, 1242–44 (2008).  Similarly, the factory's honey machines are assets that can be used over

and over to produce honey, so—unlike the raw honey inputs—the machines' costs do not

correspond to any standalone batch of honey.  *See id.* at 1235–40 (discussing raw inputs).  As

such, the costs of the jars, corks, and honey machines need to be priced into the NV of the honey

in some other way than by simply tallying their full cost.  That is part of what surrogate financial

ratios are for.[1]

Surrogate financial ratios account for asset costs (such as the cost to acquire honey

machines) through depreciation[2] or amortization[3] figures.  *See Seamless Refined Copper Pipe

and Tube from the People's Republic of China*, 75 Fed. Reg. 60,725 (Dep't Commerce Oct. 1,

2010) (final determ.) ("*Copper Pipe and Tube*") and accompanying I&D Mem. at cmt. 2.  These

figures can be itemized under factory overhead or SG&A.

As noted, Commerce chose to classify X. Campestris as an asset, rather than as a direct

material input.  I&D Mem. at 35–37.  Commerce reasoned that a certain physical property of X.

Campestris—its capacity to self-regenerate—made the bacteria look like an asset.  The bacteria's

self-regeneration meant that it was never "used up" in the production of xanthan gum:  Although

manufacturing xanthan gum required fermenting X. Campestris cells—a process that killed

individual cells—the cells grew back. *Id.*; Pl. Kelco's Br. 4 –5, 12–13.  This property allowed

Fufeng to acquire its X. Campestris before the period of investigation ("POI") had even started,

---

[1] *Compare* 19 U.S.C. § 1677b(c)(1) (instructing Commerce to include in NV "an amount for general expenses and profit"), *with* 19 C.F.R. § 351.408(c)(4) (redescribing this amount as accounting for "manufacturing overhead, general expenses, and profit"), *and, e.g.*, *Seamless Refined Copper Pipe and Tube from the People's Republic of China*, 75 Fed. Reg. 60,725 (Dep't Commerce Oct. 1, 2010) (final determ.) and accompanying I&D Mem. at cmt. 2 (explaining Commerce's practice of using surrogate financial ratios to cover the amount described in statute and regulation).

[2] "Depreciation is defined as the accounting process of allocating the cost of tangible assets to expense in a systematic and rational manner to those periods expected to benefit from the use of these assets." *Fuyao Glass Indus. Grp. Co. v. United States*, 27 CIT 1892, 1908 (2003) (internal quotation marks omitted).

[3] Amortization is the same as depreciation, only with respect to intangible assets. *See Hyundai Elecs. Indus. Co. v. United States*, 28 CIT 517, 536 n.7, 342 F. Supp. 2d 1141, 1158 n.7 (2004).

via a one-time payment.  I&D Mem. at 36.  Because Fufeng paid for its X. Campestris only once,

the bacteria's cost was not attributable to any discrete batch of xanthan gum.  Commerce

concluded that the bacteria was therefore best classified as an asset.

Commerce also rebutted an argument previously made by Kelco, that classifying X.

Campestris as an asset impermissibly omitted certain asset-related costs from the xanthan-gum

NV.  *Id.* at 37.  In making this argument, Kelco had noted that asset-related costs were normally

deemed accounted for in the surrogate financial ratios.  Yet, argued Kelco, the ratios chosen by

Commerce—drawn from a company called Thai Ajinomoto, which also produced a bacteria-

based product, monosodium glutamate ("MSG")—did not account for two particular asset-

related costs.  Namely, the Thai Ajinomoto ratios did not cover (1) research-and-development

costs and (2) bacterial acquisition costs.  *Id.*

Commerce responded that Fufeng's X. Campestris did not have any research and

development costs, because Fufeng simply bought it once and kept it.  *Id.*  As for the cost to

acquire X. Campestris, Commerce noted that there was simply no good way to account for this

cost.  The bacteria's self-regeneration imparted it with an indefinite useful life.  This made

attributing the acquisition cost over any finite period of time (that is, depreciating the cost)

inaccurate.  In sum, Commerce concluded that X. Campestris was best treated as an asset fully

accounted for in the Thai Ajinomoto surrogate financial ratios.  *Id.*

**B.      Analysis**

Kelco first claims that Commerce decision to classify X. Campestris as an asset did not

accord with its statutory mandate.  Pl. Kelco's Br. 12–14, 16; 19 U.S.C. § 1677b(c).  One of the

reasons Commerce gave for classifying X. Campestris as an asset was that Fufeng had acquired

the bacteria before the POI had started, via a one-time payment.  Yet, Kelco argues, the statute

precluded Commerce from considering "the frequency or amount of . . . [Fufeng's] payments" when deciding how to classify X. Campestris.  Pl. Kelco's Br. 16.

This claim fails.  Section 1677b(c)(4) requires Commerce to value factors of production ("FOPs") using surrogate data, thereby implicitly disallowing Commerce from using subject producers' actual payments or costs for valuation purposes.  But the statute in no way forbids Commerce from using payment data to decide whether a particular input is better described as an asset or as a direct material *prior to* attaching the appropriate surrogate value (a question determined, in part, by whether an input is an asset or a direct material).  Because the statute simply does not say whether or not using subject producers' payments at this prior step is permissible, Commerce's only statute-based obligation is to comport itself reasonably.  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  It was reasonable for Commerce to use the time that Fufeng paid for the X. Campestris as evidence that the bacteria was an asset:  Fufeng's one-time purchase and the bacteria's self-regenerating properties made it look like an asset.  Kelco's first statutory argument therefore fails.

Kelco next makes a substantial-evidence claim, taking issue with Commerce's conclusion that Fufeng "acquired" its stock of X. Campestris before the POI.  Pl. Kelco's Br. 14–16.[4]  Kelco points out that Fufeng did not own the bacteria outright, but rather licensed the "rights to exploit" it.  Pl. Kelco's Br. 15 (quoting Case Br. Rebuttal of Neimenggu Fufeng Biotechnologies Co., Ltd. ("Fufeng's Administrative Rebuttal Br.") at 43, PD 416 (Mar. 20, 2013).  Kelco then argues that the undisputed fact of Kelco's licensing controverted Commerce's conclusion that Fufeng had "acquired" the bacteria, rendering Commerce's decision unsubstantiated in evidence.  Pl.

---

[4] In its substantial-evidence claim, Kelco does not quibble with Commerce's conclusion that Fufeng paid for its X. Campestris just once; Kelco's substantial-evidence challenge is limited to Commerce's conclusion that Fufeng "acquired" the bacteria by paying for it.  Pl. Kelco's Br. 14–16.

Kelco's Br. 15; Pl. CP Kelco US, Inc.'s R. 56.2 Reply Br. for J. on Agency R. 11–12, ECF No.

60 ("Pl. Kelco's Reply Br.").[5]

Kelco's substantial-evidence claim fails.  It is coherent to acknowledge that Fufeng

licensed its X. Campestris, but to nonetheless conclude that Fufeng had acquired the license that

it owned before the POI.  And that is precisely what Commerce did when it noted that Fufeng's

acquisition "included the right to further grow and exploit" the bacteria.  I&D Mem. at 36.

In any case, identifying the precise rights that Fufeng had in its X. Campestris—a license

versus full ownership—was not essential to Commerce's ultimate conclusion that the bacteria

was an asset.  Commerce reached that conclusion on grounds that the bacteria self-regenerated,

such that Fufeng only needed to pay for the bacteria once.  *Id.*  It was this set of features that

rendered X. Campestris unlike direct material inputs used up in the production process.  Kelco's

substantial-evidence claim therefore fails.

Kelco's final claim is that Commerce's past practice mandates treating X. Campestris as

an FOP, and that 19 U.S.C. § 1677b(c) requires Commerce to assign all FOPs a surrogate value.

Pl. Kelco's Br. 12–16.  According to Kelco, Commerce has consistently applied a five-factor test

to determine whether an alleged input is in fact a direct material input or something else (like an

asset), but that the agency did not proceed through these factors in its analysis below.  *Id.*

Kelco's proposed test was set forth in *Copper Pipe and Tube*:

> [T]he Department will typically value a material as a direct material input if it is
> 1) consumed continuously with each unit of production, 2) required for a
> particular segment of the production process, 3) essential for production, 4) not
> used for "incidental purposes," or 5) otherwise a "significant input into the
> manufacturing process rather than miscellaneous or occasionally used materials."

---

[5] In its reply, Kelco raises another substantial-evidence claim:  If classifying X. Campestris as an asset
meant that the bacteria's acquisition cost would not be priced into the xanthan-gum NV (because the bacteria's
indefinite useful life made cost depreciation inaccurate) then asset classification was unreasonable.  Pl. Kelco's
Reply Br. 8–10.  Kelco did not make this argument in its lead brief, so the argument is waived.  USCIT R. 81(l).

*Copper Pipe and Tube* and accompanying I&D Mem. at cmt. 7.  Had Commerce applied this five-factor test, it would have found that X. Campestris was a direct material input, for which a surrogate value was statutorily required.  *See* Pl. Kelco's Br. 13.

Kelco's claim fails.  When an agency establishes a consistent practice, this can bind it to at least explain any departure therefrom.  *E.g.*, *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (holding that agency acts arbitrarily and capriciously when it "consistently followed a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice").  However, contrary to Kelco's claim, Commerce has not used one monolithic test to evaluate whether or not an item is a direct material input or not, but has instead proceeded case by case.  In *Copper Pipe and Tube*, Commerce did provide a list of considerations "typically" made.  *Copper Pipe and Tube* and accompanying I&D Mem. at cmt. 7. But this was simply an aggregation of different methods used in various past cases.[6]  And Commerce avoided ossifying those methods into a practice by designating them as typical, thus welcoming the possibility of other considerations (such as, for example, frequency of payment).  *Id.*  In sum, then, Commerce's past practice did not require it to consider the five factors listed in *Copper Pipe and Tube*.  Those factors therefore could not compel Commerce to conclude that X. Campestris was a direct material input, for which a surrogate value was statutorily required.  Commerce's past-practice claim as to Commerce's valuation of X. Campestris fails and Commerce's decision to treat the bacteria as an asset withstands this court's review.

---

[6] *Compare Copper Pipe and Tube* and accompanying I&D Mem. at cmt. 7 & nn.97–101 (citing as the primary authority for the list of considerations a similar listing set forth in *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,485 (Dep't Commerce July 15, 2008) (final determ.) and accompanying I&D Mem. at cmt. 27), *with Bridgestone Americas, Inc. v. United States*, 710 F. Supp. 2d 1359, 1364 (2010) (describing the listing from *Pneumatic Off-The-Road Tires* as "merely a survey of various criteria taken into consideration in different past determinations," as opposed to a "hard-and-fast four-prong standard")

**II.     Commerce's Decision to Use Thai Ajinomoto's Financial Statements to Calculate Surrogate Financial Ratios Was Unsubstantiated in Evidence**

Fufeng challenges Commerce's decision to calculate the surrogate financial ratios using Thai Ajinomoto's financial statements, rather than those of Thai Fermentation, another Thai MSG producer.  Commerce rejected Thai Fermentation's financial statements on grounds that two paragraphs in one footnote of the statements were left untranslated.  I&D Mem. at 16 & n.70; *see* Pl. Fufeng's Br. in Support of Pls.' Mot. for J. on Agency R. 19–20, ECF No. 26 ("Pl. Fufeng's Br."); Def.'s Resp. to Pls.' Mot. for J. on Agency R. 17, ECF Np. 43 ("Gov't Resp. Br.").  Once Commerce had rejected the Thai Fermentation statements, it then accepted the Ajinomoto statements as the only statements left on record, despite evidence that Ajinomoto had received subsidies from the Thai government.  Fufeng claims that Commerce broke with past agency practice when it rejected the Thai Fermentation statements on grounds of incompleteness alone.  Fufeng further claims that Commerce's decision to adopt the Thai Ajinomoto statements was contrary to substantial evidence.

The court remands to Commerce for further explanation.  Commerce never addressed why the weakness of the Thai Fermentation statements—incompleteness—was worse than the weakness of the Thai Ajinomoto statements: evidence of subsidies.  Rather, by first considering (and rejecting) the Thai Fermentation statements and then subsequently accepting the Thai Ajinomoto statements for lack of an alternative, Commerce effectively ignored the weakness of the Thai Ajinomoto statements.  The substantial-evidence standard does not permit such one-sided evaluation of potential data sources.  *See Blue Field*, 37 CIT at __, 949 F. Supp. 2d at 1328–31.

A.      **Background**

As noted above, surrogate financial ratios are calculated by drawing upon the financial

statements of an appropriate company, usually a producer of similar goods from the surrogate

country.  Commerce's statutory task in selecting the surrogate-ratios company is to ensure that

the company provides the "best available information."  19 U.S.C. § 1677b(c)(1)(B).  In the

investigation below, Commerce had three potential surrogate-ratio companies to choose from:

Thai Ajinomoto, Thai Fermentation, and Thai Churos.  I&D Mem. at 14–16.  Commerce rejected

the financial statements of Thai Churos and Thai Fermentation on grounds of incompleteness.

The Thai Churos statements were "missing several footnotes" and the Thai Fermentation

statements lacked "complete English translations."  *Id.* at 16.  Although Commerce did not go

into detail about what exactly was missing from the Thai Fermentation statements, the record

undisputedly shows that they were incomplete insofar as two paragraphs at the bottom of

accounting note twelve, concerning depreciation of assets, were untranslated.  Pl. Fufeng's Br.

19–20; Gov't Resp. Br. 17.  Accounting note twelve nonetheless contained a fully translated

depreciation schedule, complete with a line item for "Depreciation in statement income" for

2011: 140,861,456.76 Thai baht.  Pl. Fufeng's Br. Attach. 2.

After rejecting the Thai Fermentation and Thai Churos statements, Commerce then found

Thai Ajinomoto's statements to be the best available.  Commerce reasoned that, although the

Thai Ajinomoto statements were imperfect insofar as they showed "evidence of the receipt of

countervailable subsidies," they were the only statements left to use.  I&D Mem. at 16–17.

Commerce acknowledged that it had a general practice of disregarding such statements, but cited

a past instance in which it had resorted to subsidy-affected statements given nothing better on

record.  *Id.* (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into*

*Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17,

2012) (final determ.) and accompanying I&D Mem. at cmt. 2)

### B.    Analysis

Fufeng claims that Commerce's rejection of the Thai Fermentation financial statements

was contrary to both past agency practice and substantial evidence.  *See* Pl. Fufeng's Br. 13–24.

According to Fufeng, Commerce's past practice is to "only disregard incomplete financial

statements . . . where the statement is missing key sections . . . that are vital to [Commerce's]

analysis and calculations."  Pl. Fufeng's Br. 17 (quoting *Galvanized Steel Wire from the People's*

*Republic of China and Mexico*, 76 Fed. Reg. 23,548, 23,551 (Dep't Commerce Apr. 27, 2011)

(initiation of investigation) ("*Galvanized Steel Wire*")).  Fufeng argues that Commerce's decision

to reject the Thai Fermentation financial statements was out of accord with this past practice

because Commerce never explained why the information missing from the Thai Fermentation

statements was vital.  *See id.* at 17–22.

Fufeng also makes a substantial-evidence claim.  Fufeng argues that, by eliminating the

Thai Fermentation financial statements and then accepting the Thai Ajinomoto statements as the

only ones available, Commerce effectively ignored the weakness in the Ajinomoto statements:

evidence that Ajinomoto had received countervailable subsidies.  *Id.* at 22–24.

The court accepts Fufeng's substantial-evidence claim, and remands to Commerce to

further explain why it selected the Thai Ajinomoto financial statements.  When presented with

multiple imperfect potential surrogate-data sources, Commerce must faithfully compare the

strengths and weaknesses of each before deciding which to use.  *Blue Field*, 949 F. Supp. 2d at

1328–31.  Nor is this general rule of any less import when it comes to selecting the best set of

financial statements to use for surrogate financial ratios.  *See, e.g.*, *Tianjin Magnesium Intern.*

*Co., Ltd. v. United States*, 34 CIT __, __, 722 F. Supp. 2d 1322, 1340 (2010) (remanding

Commerce's financial-statement choice on grounds that Commerce insufficiently explained why

it rejected one imperfect set of statements, yet accepted another).  In this case, Commerce

rejected the Thai Fermentation financial statements because two paragraphs at the bottom of

accounting note twelve were left untranslated.  But Commerce then accepted the Thai Ajinomoto

financial statements despite evidence that Ajinomoto had received countervailable subsidies.

Commerce's only reason for accepting the Thai Ajinomoto statements was that there were no

other financial statements left on record.  I&D Mem. at 17.  That was a conundrum created by

Commerce itself, when the agency chose to preemptively reject the Thai Fermentation

statements.  Rather than fashioning itself a pigeonhole by considering and then rejecting the Thai

Fermentation statements before ever reaching the Thai Ajinomoto statements, Commerce should

have compared the two side-by-side.  On remand, Commerce must explain why, on the whole,

the Thai Ajinomoto statements were a better source than the Thai Fermentation statements.

    Fufeng also claims that Commerce's decision to reject the Thai Fermentation financial

statements was out of accord with a past practice of *only* rejecting incomplete financial

statements when the missing information is "vital."  Pl. Fufeng's Br. 17–22.  As already noted,

an agency's consistent practice can bind it to explain departures.  *See, e.g.*, *Consol. Bearings*,

348 F.3d at 1007.  But Commerce has not bound itself to a practice of *only* rejecting financial

statements when they are missing vital information.  To be sure, Commerce has occasionally

characterized its rule as such—even before this court.  *Ass'n of Am. Sch. Paper Suppliers v.*

*United States*, 35 CIT __, __, 791 F. Supp. 2d 1292, 1304 (2011) (recounting Commerce's

argument that the agency had the aforementioned past practice, wherein Commerce cited

*Galvanized Steel Wire* at 23,551).  Notwithstanding these characterizations, the fact remains that

Commerce has often rejected incomplete financial statements without finding that the statements

lacked vital information.  *See id.* at __ & n.15, 791 F. Supp. 2d at 1302–03 & n.15 (citing several

such instances).  These examples show that Commerce does not really reject financial statement

as sparingly as Fufeng claims, even though Commerce has sometimes suggested otherwise.

And, perhaps precisely for this reason, this court has before declined the invitation to tie

Commerce's hands to a practice of rejecting incomplete financial statements only when they lack

vital information.  *See id.* at 1304 (holding only that Commerce does *not* have a practice of

*always* rejecting incomplete financial statements).

        In keeping with this court's own past rulings, then, the court will not now hold that

Commerce rejects financial statements only when missing vital information.  As such, on

remand, Commerce will not be bound to either accept the Thai Fermentation financial statements

or else to specifically find the statements to be lacking vital information:  Rather, Commerce's

only duty will be to compare and contrast the Thai Fermentation and Thai Ajinomoto financial

statements, and to explain why the Thai Ajinomoto statements constitute a better source.[7]

---

[7] Alternatively, if Commerce finds that the Thai Fermentation statements are missing "vital information," then Commerce should follow its past practice of rejecting such statements.  *See, e.g.*, *Wooden Bedroom Furniture from the People's Republic of China*, 71 Fed. Reg. 70,739 (Dep't Commerce Dec. 6, 2006) (final results of new shipper review) ("*Wooden Bedroom Furniture*") and accompanying I&D Mem. at cmt. 2.  (Although Commerce does not have a past practice of *only* rejecting financial statements that are missing key sections of vital information, *see Ass'n of Am. Sch. Paper Suppliers*, 35 CIT at __ & n.15, 791 F. Supp. 2d at 1302 & n.15, Commerce *does* have a past practice of rejecting those statements that *are* missing such information.  *Id.*)  In keeping with this practice, Commerce has often deemed financial statements to be unusable when they are missing all or many accounting notes.  *See Floor-Standing Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China*, 77 Fed. Reg. 14,499 (Dep't Commerce Mar. 12, 2012) and accompanying I&D Mem. at cmt. 2; *Certain Steel Nails from the People's Republic of China*, 75 Fed. Reg. 34,425 (Dep't Commerce June 17, 2010) (final new shipper review) and accompanying I&D Mem. at cmt. 4; *Wooden Bedroom Furniture* and accompanying I&D Mem. at cmt. 2; *Silocomanganese from Kazakhstan*, 67 Fed. Reg. 15,535 (Dep't Commerce Apr. 2, 2002) (final determ.) and accompanying I&D Mem. at cmt. 3.

**III.    Commerce's Selection of the World Bank's *Doing Business 2013: Trading Across Borders Thailand* as its Surrogate Source for Valuing Fufeng's Truck Freight Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

Next, Fufeng challenges Commerce's decision to value Fufeng's truck-freight costs using data from *Doing Business 2013* rather than competing data from a website called Dxplace. To select *Doing Business 2013*, Commerce considerations included a multifactor test that the department has established through past practice. *See Xiamen Intern. Trade and Indus. Co., Ltd. v. United States* (*XITIC*), 37 CIT __,__, 953 F. Supp. 2d 1307, 1312–13 (2013): Commerce concluded that *Doing Business 2013* better satisfied this test than the competing data from Dxplace. Commerce reached this conclusion by tallying each factor in the multifactor test that the data sources met or did not meet. Because *Doing Business 2013* met more factors, Commerce selected it. I&D Mem. 38–39.

Fufeng claims that Commerce's tallying approach to the multifactor test was unsupported by substantial evidence because it ignored qualitative differences in the degree to which *Doing Business 2013* and the Dxplace data satisfied one of the test's factors. Fufeng also claims that Commerce's selection of *Doing Business 2013* was contrary to past agency practice. Pl. Fufeng's Br. 24–36.

The court rejects Fufeng's claims. Commerce's tallying approach was reasonable in this particular case. And Commerce's decision-making did not run afoul of past practice, because Fufeng has not established that there was any practice.

**A.    Background**

In its preliminary determination, Commerce used a report called *Costs of Doing Business in Thailand* as its source for surrogate truck-freight values. I&D Mem. at 38. But both Fufeng and Kelco objected to the use of this report, and put on record alternate data sources: Fufeng, the Dxplace data, and Kelco, the *Doing Business 2013* report. So, to make its final determination,

Commerce had to choose which of the two sources to use.  After administrative briefing on the

matter, Commerce concluded that *Doing Business 2013* was the better source because it met

more factors of the multifactor test than did Dxplace.  *See id.* at 38–39.

In its multifactor test, Commerce considers whether each source (1) provides a broad

market average covering a range of prices, (2) is publicly available, (3) is specific to the input in

question, (4) is tax and duty exclusive, and (5) is contemporaneous with the review period.

*XITIC*, 37 CIT at __, 953 F. Supp. 2d at 1312–13.  Applying this test, Commerce found that

"[b]oth the 2010 Dxplace and [*Doing Business 2013*] data satisfy the criteria of public

availability, broad market average and tax and duty exclusivity," but that the *Doing Business*

*2013* report was more contemporaneous than the Dxplace data.  I&D Mem. at 38–39.  In other

words, *Doing Business 2013* satisfied four factors in the multifactor test, whereas the Dxplace

data satisfied only three.

Commerce also provided an extended explanation of why both data sets satisfied the

broad-market-average criterion:

> [T]he *Doing Business 2013: Thailand* report provides information for the inland
> freight cost of shipping a container on a route from Bangkok to the port 133
> kilometers away.  On the other hand, the 2010 Dxplace data provide price points
> for three types of trucks from multiple companies and include the cost to ship
> from Bangkok to 76 different cities throughout the country, yielding a total of 228
> price points.  However, the Dxplace data come from a single date in June 2010
> and it is unclear if these prices are six-month averages or a snapshot in time.
> Additionally, it appears that the Dxplace website is still currently used for
> shipping rates, but no other historical data are provided. . . .  Additionally, as
> stated in *Certain Polyester Staple Fiber*, the Department prefers *Doing Business*
> *2013: Thailand* despite the fact that it provides freight costs solely from the main
> city to the port because it reflects freight costs for multiple vendors and users (*i.e.*,
> shipping lines, customs brokers and banks).

I&D Mem. at 38 –39 (footnotes omitted).  Put more succinctly, Commerce believed that both

data sets satisfied the broad-market-average criterion, but with different kinds of breadth.

Dxplace data satisfied the broad-market-average criterion because it included multiple truck

types, multiple companies, and multiple routes.  On the other hand, it was unclear whether the

Dxplace data was temporally broad.  *Doing Business 2013* satisfied the broad-market-average

factor because it included multiple vendors and users.

### B.      Analysis

In making its substantial-evidence claim, Fufeng argues that Commerce's tallying

approach ignored differences in the degree to which *Doing Business 2013* and the Dxplace data

satisfied the broad-market-average factor.  Pl. Fufeng's Br. 29–36.  According to Fufeng

Dxplace featured a much broader market average than *Doing Business 2013*, but tallying ignored

this strength.  As for its past-practice claim, Fufeng cites three past investigations where

Commerce took a different approach, and argues that these investigations evidence binding past

practice.  *Id.* at 32–33; Pl. Fufeng's Reply Br. 15–16, ECF No. 59.

Both of Fufeng's claims fail.  With respect to Fufeng's substantial-evidence claim, the

court cannot hold that Commerce's tallying approach was unreasonable in this particular case.

As a general matter, "Commerce has not identified a hierarchy among the[ multifactor test's]

factors, and the weight accorded to a factor varies depending on the facts of each case." *XITIC*,

37 CIT at __, 953 F. Supp. 2d at 1313.  The tallying approach was reasonable in this case

because the supposed difference in the extent to which the two data sources satisfied broad

market average was not as extreme as Fufeng claims.  To be sure, Dxplace was far more

geographically broad than *Doing Business 2013*, and Commerce acknowledged as much.  I&D

Mem. at 39.  But it was unclear whether Dxplace featured temporal breadth, and *Doing Business

2013* boasted breadth of a different kind: it tracked "multiple vendors and users." *Id.*  Therefore,

the facts of this case do not clearly indicate a discrepancy in broad market average so grave that

Commerce could not take a tallying approach.[8]

      Fufeng's past-practice claim also fails.  Fufeng offers three investigations as evidence of

three different purported past practices that it argues contravene Commerce's selection.  Pl.

Fufeng's Br. 32–33; Pl. Fufeng's Reply Br. 15–16.  But citing isolated investigations does not

prove the existence of past practices; it just proves that Commerce thought differently on

different facts at different times.  Fufeng's past-practice claim is therefore as unavailing as its

substantial-evidence claim, and Commerce's decision to use *Doing Business 2013* to value truck

freight stands.

### IV.    Commerce's Decision to Value Fufeng's Corn as a Direct Input, Rather Than to Value Cornstarch as an Intermediate Input, Is Supported by Substantial Evidence and Otherwise in Accordance with Law

      Kelco claims that Commerce's decision to value Fufeng's corn as a factor of production

was unsupported by substantial evidence.  According to Kelco, Commerce should have instead

---

[8] Fufeng also supports its substantial-evidence claim with three other arguments: (1) Commerce unreasonably ignored the specificity factor, a factor that would have favored Dxplace, Pl. Fufeng's Br. at 30–31, (2) Commerce unreasonably focused "almost entirely" on the contemporaneity factor, *id.* at 31–33, and (3) Commerce unreasonably discussed its use of *Doing Business 2013* in other investigations, *id.* at 33–36.

    The court declines to address Fufeng's first argument that Commerce unreasonably ignored the specificity criterion.  Fufeng did not exhaust its administrative opportunity to raise specificity as a concern.  28 U.S.C. § 2637(d); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013); *see* Case Br. of Neimenggu Fufeng Biotechnologies Co., Ltd., PD 401 (Mar. 12, 2013); Fufeng's Administrative Rebuttal Br. Fufeng argues that it had no opportunity to voice its objection, because Commerce did not adopt *Doing Business 2013* until its final determination.  Pl. Fufeng's Reply Br. 12.  But Fufeng was on notice that *Doing Business 2013* was under consideration by Commerce, such that it even took administrative briefing as an opportunity to the compare *Doing Business 2013* with Dxplace.  Fufeng's Administrative Rebuttal Brief at 36–40.  In its comparison, Fufeng analyzed other of the factors in the multifactor test.  There is therefore no reason Fufeng could not have analyzed the specificity of *Doing Business 2013* versus Dxplace.  It did not do so then, so it cannot now.

    Fufeng's second argument fails because its premise is false.  Commerce did not focus "almost entirely" on the contemporaneity factor.  Pl. Fufeng's Br. 31–33.  As discussed, contemporaneity was one of four factors Commerce weighed.  Furthermore, Commerce's most in-depth explanation went to the broad-market-average factor—not contemporaneity.

    Fufeng's third and final argument—that Commerce unreasonably discussed the fact that it had used *Doing Business 2013* in other investigations—also fails.  Even assuming that Commerce should not have discussed its prior use of *Doing Business 2013*, Commerce provided a *de novo* multifactor analysis of *Doing Business 2013*.  Commerce's use of *Doing Business 2013* was justified on the basis of this first-impression analysis.

applied its intermediate-input method, treating the product that Kelco made out of its corn,

cornstarch milk, as an input.  Commerce declined to apply the intermediate-input method

because Commerce found that neither of the method's predicate elements was met, and Kelco

argues this finding was unreasonable.  *See* Pl. Kelco's Br. 18–20.  The court rejects Kelco's

claim.

### A.     Background

In determining what counts as a factor of production, Commerce's general policy is to

follow producers' actual production experience.  *See Drill Pipe from the People's Republic of

China*, 76 Fed. Reg. 1966 (Dep't Commerce Jan. 11, 2011) and accompanying I&D Mem. at

cmt. 12.  So, if a producer self-manufactures one of the products used to construct the export,

then Commerce will value the items used to manufacture the intermediate product as inputs.  By

contrast, if a producer buys a necessary product readymade, then Commerce will value the

product itself as an input.  But there is an important exception to this rule: the intermediate-input

method.  Under the intermediate-input method, Commerce will occasionally treat a self-

produced product as an input even though it has been made in house.  *Id.*  Commerce applies this

exception when "it is clear that attempting to value the factors used in a production process

yielding an intermediate product would lead to an inaccurate result because a significant element

of cost would not be adequately accounted for in the overall factors buildup."  *Id.*  In short,

Commerce uses the intermediate-input method when (1) certain costs are not accounted for in the

input buildup and (2) those costs are significant.

In administrative briefing, Kelco asked that Commerce apply the intermediate-input

approach to Fufeng's cornstarch milk, which Kelco manufactured in house from off-grade corn it

had purchased.  Case Brief of CP Kelco US, Inc. ("Kelco's Case Br.") at 4–10, PD 407–09 (Mar.

13, 2013).  Kelco argued that the intermediate-input method was appropriate because (1) the overhead costs of wet-milling the corn (to produce the cornstarch milk) would not be captured in the Thai Ajinomoto surrogate financial ratios, and (2) those wet-milling costs were significant. As evidence of cornstarch milk's significant, unaccounted-for costs, Kelco offered an Energy Star report.  But, notably, the Energy Star report detailed the costs of producing different products: dried cornstarch (made by drying cornstarch milk), as well as more complex products like ethanol and corn-based sweeteners.  I&D Mem. at 50.  Relatedly, Kelco suggested that Commerce remedy the alleged undervaluation by treating dried cornstarch—not cornstarch milk—as the input in Fufeng's xanthan-gum-production process.  *See* Kelco's Case Br. at 4–10 (designating "cornstarch"—not cornstarch milk—as the proper intermediate input); *see also* I&D Mem. at 49.

Commerce addressed Kelco's intermediate-input proposal in its final determination. Commerce first pointed out that, even were it to find both of the intermediate-input elements met, the appropriate intermediate input to supply would be cornstarch milk, not dried cornstarch. I&D Mem. at 49.  Having so specified, Commerce then considered the elements of the intermediate-input test.

Addressing the second element first, Commerce found no evidence that the overhead costs of producing cornstarch milk were significant.  To evaluate overhead-cost significance, Commerce compared the amount of capital equipment and energy used to produce cornstarch milk to the amount used to produce xanthan gum.  I&D Mem. at 49.  If producing cornstarch milk used a low proportion of capital-equipment and energy, then the cornstarch-milk production process was likely to be simple relative to the xanthan-gum process.  And if cornstarch milk's

production process was relatively simple, then the overhead costs of the process were likely to be

relatively low (or, in other words, insignificant).

Commerce obtained the capital-equipment and energy-usage figures needed for this

comparison from Fufeng's data submissions.  I&D Mem. at 49 n.215.  That is, Commerce did

not accept Kelco's suggestion that it use figures from the Energy Star Report.  Commerce

explained that the Energy Star report addressed the production of a different product—dried

cornstarch—whose production carried additional overhead costs.  *Id.* at 50.  Looking to Fufeng's

data submissions, then, Commerce found that "Fufeng's starch-making facility require[d] less

capital equipment and less electricity to operate than d[id] the rest of the xanthan gum production

process"; in fact, producing cornstarch milk required less than four percent of the total energy

needed to produce xanthan gum.  *Id.* at 49 & n.215 (citing Section D Resp. for Neimenggu

Fufeng Biotechnologies Co., Ltd. ("Section D Resp.") at 5–6, PD 118 (Sept. 27, 2012)); *see also*

Def.-Intervenor Fufeng's Resp. Br. in Opp'n to CP Kelco US, Inc.'s R. 56.2 Mot. for J. on

Agency R. 19, ECF No. 41 ("Def.-Intervenor Fufeng's Resp. Br.").  Given these proportions,

Commerce could not conclude that the overhead costs to produce cornstarch milk were

significant.

Turning to the first element of the intermediate-input test, Commerce also found that the

overhead costs of producing cornstarch milk were accounted for in the Thai Ajinomoto surrogate

financial ratios.  *Id.* at 49–50.  Commerce admitted that Thai Ajinomoto did not have an

analogous starch-making process in its MSG plant (Thai Ajinomoto started with tapioca starch,

rather than with unprocessed cassava root), but noted that Thai Ajinomoto also faced a number

of production costs that Fufeng did not.  Commerce's point was that any failure of the Thai

Ajinomoto surrogate to match cornstarch-production costs specifically was offset by

overcompensation in other cost centers.  In sum, Commerce concluded that applying the

intermediate-input exception was unwarranted, because neither of the two elements necessary to

trigger it had been met.

B.     **Analysis**

Kelco now claims that Commerce's decision to value corn as a direct input, rather than

cornstarch milk as an intermediate input, was unsupported by substantial evidence.  According to

Kelco, record evidence demonstrated that both intermediate-input factors were met, such that

Commerce was bound by its intermediate-input method to treat cornstarch milk as a factor of

production.  Pl. Kelco's Br. 18–20.  In making this claim, Kelco essentially repeats its

administrative claim below, except that it replaces cornstarch milk with cornstarch as the

intermediate input it seeks.[9]

Kelco's claim must fail, because Commerce had the support of substantial evidence when

it concluded that neither element of the intermediate-input test was met.  With respect to the

second element, Commerce concluded that the overhead costs of cornstarch milk were

insignificant because producing cornstarch milk required less capital equipment, and far less

energy, than producing finished xanthan gum.  I&D Mem. at 49; *see also* Def.-Intervenor

Fufeng's Resp. Br. 19.  Commerce's logic—that a production process with relatively low capital-

equipment and energy costs was likely to be relatively simple, and therefore to bear insignificant

overhead costs—was reasonable.

---

[9] It is far from clear that exhaustion doctrine permits Kelco to switch claims like this.  Whether or not
Kelco *meant* to directly ask Commerce to use cornstarch milk as an intermediate input, it did not.  Because Kelco
did not do so, Kelco's license to seek such a remedy from this court is at best suspect.  28 U.S.C. § 2637(d).

In any case, Kelco does not take issue with Commerce's logical approach, at least not directly.[10]  Rather, Kelco second-guesses its factual underpinnings, suggesting that Commerce was wrong to conclude that starch-making really uses less capital equipment and energy than the rest of the xanthan-gum process.  *See* Kelco's Reply Br. 16.  Kelco again commends the Energy Star report, which suggests that the entire xanthan-gum-production process uses just 88% of the energy that producing *dried cornstarch* does, and surmises that producing cornstarch milk must be similarly energy intensive.  But, as Commerce has already pointed out, this is question begging.  *See* I&D Mem. at 50.  Dried cornstarch requires further processing than cornstarch milk, and the energy consumption involved in producing dried cornstarch could well come from this additional work.  Kelco has provided no evidence to the contrary, and there is no reason to doubt Commerce's conclusion that the first element of the intermediate-input test was not met.[11]

Even assuming Kelco had so undermined Commerce's first-element conclusion, Commerce's overarching intermediate-input finding would still stand.  That is because it was reasonable for Commerce to find, under the first intermediate-input element, that the cost of converting corn to cornstarch milk was assimilated in other NV factors.  As discussed above, Commerce found that the conversion cost was accounted for in the Thai Ajinomoto surrogate

---

[10] In its reply, Kelco offers a number of alternative measures of the overhead costs of producing cornstarch milk, which Kelco believes show such costs to be significant.  Kelco references (1) the amount of capital equipment used to produce cornstarch milk (apparently viewed in isolation, without comparison to the amount used to produce xanthan gum), (2) the number of steps in the cornstarch-milk production process versus in the xanthan-gum process, and (3) the amount of labor used in each process.  Pl. Kelco's Reply Br. 13–16.  But Kelco failed to make any argument about these indicia either before Commerce or in its lead brief before this court.  Therefore, any potential argument is both unexhausted and waived.  *See* 28 U.S.C. § 2637(d); USCIT R. 81(l).

[11] At oral argument, Kelco provided an additional argument against Commerce's conclusion that producing cornstarch milk was less energy intensive than the rest of xanthan-gum production.  According to Kelco, Commerce made this relativistic finding using energy data from the preliminary determination, even though it had changed its energy methodology by the time the final determination came around.  Had Commerce used its final-determination energy data, says Kelco, it would not have found the energy costs of cornstarch production to be lower than general production costs.  Whether or not this argument has merit, Kelco raised it neither in its lead nor its reply briefing.  It is therefore waived.  USCIT R. 81(l).

financial ratios—not because those ratios included an analogous cost for tapioca production, but instead because it included offsetting costs that Fufeng did not face.  I&D Mem. at 49–50. Nothing in Kelco's briefing undermines this reasoning:  Kelco emphasizes that the Thai Ajinomoto ratios did have a tapioca-conversion cost in particular, Pl. Kelco's Br. 19–20, but Commerce never said it did, choosing instead to rely on other offsetting costs.  Therefore, Kelco has failed to convince the court that Commerce's first-prong and second-prong findings were unsupported by substantial evidence.  Kelco's substantial-evidence claim is accordingly rejected in full.

V.      **Commerce's Decision to Value Fufeng's Corn as Corn Imported Under the Thai Tariff Heading for Corn "Fit for Animal Feed" Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

Kelco claims that Commerce's decision to value Fufeng's corn as corn imported under the "fit for animal feed" heading of the Thai Tariff Schedule was unsupported by substantial evidence.[12]  According to Kelco, Commerce's selection of the "animal feed" heading was unreasonable because the [[


                  ]].  Pl. Kelco's Br. 21.  Kelco further argues that Commerce unreasonably rejected Kelco's suggestion that Commerce consult the Thai Agricultural Standard for Maize ("Thai Corn Standard") before deciding how to value Fufeng's corn.  Pl. Kelco's Br. 23–25.  Kelco's claim fails because Commerce's selection of the "animal feed" heading was reasonable.

A.      **Background**

After determining that Fufeng's corn could be valued as a direct input, Commerce was left with the task of assigning a surrogate value for the input.  In order to choose the surrogate

---

[12] Commerce determined the value of corn imported under the "fit for animal feed" heading of the Thai Tariff Schedule, as well as under other corn headings, by consulting the Global Trade Atlas.  Prelim. Surrogate Value Determination at 2, 7.

value, Commerce needed to match the actual corn used by Fufeng with the value that it would

have in the surrogate country, Thailand.  *See* 19 U.S.C. § 1677b(c)(1), (4); Pl. Kelco's Br. 28

(describing the relevant corn as the "<u>actual</u> corn consumed by Fufeng").  Commerce's source for

potential surrogate values was the Thai Tariff Schedule.  According to that schedule, corn

imported under tariff heading 1005.90.90001, entitled "Maize Corn, Fit For Human

Consumption," had an average unit value ("AUV") of $0.897 per kilogram, ("/kg"), corn

imported under HTS 1005.90.90090, entitled "Maize Corn, Other," had an AUV of $0.726/kg,

and corn imported under HTS 1005.90.90002, entitled "Maize Corn, Fit For Animal Feed," had

an AUV of $0.114/kg.  Fufeng's Post-Prelim. Surrogate Value Rebuttal Submission ("Fufeng's

Post-Prelim. Surrogate Values") at Ex. 1, PD 387 (Mar. 5, 2013).  Commerce had to choose

which heading's AUV (or combination of heading AUVs) best captured the value of Fufeng's

corn.

       In its preliminary determination, Commerce valued Fufeng's corn according to the AUV

of HTS 1005.90.90002, the heading designated to corn "fit for animal feed."  Prelim. Surrogate

Value Determination at 5.  As noted, the "animal feed" AUV was $0.114/kg, the lowest of the

three tariff-heading AUVs.  Fufeng's Post-Prelim. Surrogate Values at Ex. 1.  Commerce chose

this heading "based on Fufeng's description of the corn it purchase[d]."  Prelim. Surrogate Value

Determination at 5 (citing Supplemental Section D Resp. for Neimenggu Fufeng Biotechnologies

Co., Ltd. at 3–4 and Ex. SD-8, PD 257 (Nov. 28, 2012) ("Supplemental Section D. Resp.")).

Fufeng had described its corn as "off grade," and noted that the [[

                                                                    ]].  Supplemental Section D

Resp. at 3–4 and Ex. SD-8.

Kelco objected to Commerce's preliminary selection of the "animal feed" heading.

Kelco's Case Br. at 10–26.  Kelco argued that Fufeng's corn description (upon which Commerce

had based its selection of the "animal feed" heading) was misleading.  In Kelco's own words,

> Notwithstanding [[
>
> ]],
> Fufeng has continued throughout this investigation to publicly refer to its corn as
> "off-grade," [[
>
> ]]  By using the technical
> term "off-grade" in its filings (while simultaneously disavowing that the term
> "off-grade" conveys any information regarding the nature of its corn inputs,
> [[
>
>
> ]], to position its corn inputs to be valued as
> "feed-grade" by [Commerce] in its normal value calculation, in an attempt to
> reduce [Fufeng's] calculated margin.

*Id.* at 11–12.  Put another way, Kelco was concerned that Fufeng had publicly described its corn

as "off grade" to imply that Fufeng's corn [[

]].  Then, in its confidential submissions, Fufeng had [[


]].  Commerce had chosen to value Fufeng's corn using the

"animal feed" AUV because of Fufeng's deceptive description, not because the AUV actually

matched the quality of Fufeng's corn.  Commerce's decision to use the "animal feed" heading

was therefore erroneous in Kelco's view.

To remedy the problem, Kelco proposed valuing Fufeng's corn through a weight-

averaging of the tariff-heading AUVs.  *Id.* at 23.  Each tariff-heading AUV would be weighted

according to how much of Fufeng's corn could actually be imported under the relevant tariff

heading.  *See id.* at 19–24.  Kelco said Commerce could determine which corn matched which

heading by referring to a third source, the Thai Corn Standard.  The Thai Corn Standard is a

voluntary certification standard:  It sets out a series of four corn categories along with the criteria

corn-selling merchants must meet if they want their corn to be certified within a particular

category.  *Id.* at 22 (citing Post-Prelim. Surrogate Value Submission at Ex. 10 §1 & tbl.2, PD 357

(Feb. 22, 2013); *see also* Pl. Kelco's Br. 23–26.  The categories do not expressly align with the

Thai tariff headings:  That is, the categories are not labeled as covering corn for "human

consumption," "animal feed," and "other corn," but are instead enumerated one through four.

Post-Prelim. Surrogate Value Submission at Ex. 10 tbl.2.  However, the standard's standalone

scope provision does specify that the standard covers corn "for human consumption, feed, [and]

food and feed raw materials," and the table setting forth the corn categories bears the following

note:  "Maize kernels for food or food raw material shall not be lower than class 2."  *Id.* at Ex. 10

§ 1 & tbl.2.

Kelco argued that the categories in the Thai Corn Standard correlated with the Thai tariff

headings, such that Commerce could determine which tariff heading corn would enter under by

categorizing the corn under the standard.  Kelco's Case Br. at 19–24.  Kelco based this argument

on the standard's scope provision and note:  Reading those sources together, Kelco inferred that

the two more stringent certification categories were reserved for human-consumption corn, while

the two less stringent categories were for feed-grade corn.  *Id.* at 22–23.  So interpreted, the

standard's categories dovetailed with the tariff headings.  Corn certifiable under the standard's

two more-stringent human-consumption categories would be imported under the "fit for human

consumption" heading, while corn certifiable under the feed categories would be imported as

corn "fit for animal feed."  *Id.*  And corn too poor in quality to be certified under any of the Thai

Corn Standard's four categories would be imported under the "other corn" heading.  *Id.*  Kelco

further argued that [[                              ]] of Fufeng's corn would fail certification under any of

the Thai Corn Standard's four categories.  *Id.*  Therefore, using the Thai Corn Standard to decide

what portion of Fufeng's corn would enter under each tariff heading, and weight-averaging

accordingly, would result in a corn value [[                    ]] the AUV for [[

]].  *See* Fufeng's Post-Prelim. Surrogate Values at Ex. 1.

In the final determination, Commerce stood by its choice to value Fufeng's corn

according to the "animal feed" AUV, and accordingly rejected Kelco's proposed weight-

averaging approach.  *See* Fufeng Final Determination Analysis Mem. at 9–10.  Commerce

explained that, contrary to Kelco's contention, it had not selected the "animal feed" heading

based on a mistaken belief that Fufeng's corn satisfied any tier of the Chinese commercial

standard (including the "off grade" or "feed grade" tiers).  Rather, Commerce had chosen the

"animal feed" heading based on the fact that the "[[

]]."  *Id.* at 9.  In other words,

Commerce intended the "animal feed" AUV to reflect the fact that Fufeng's corn was of such

poor quality that it did not satisfy the Chinese commercial standard in any respect.

Commerce further explained that Kelco's proposed weight-averaging approach was

"distortive."  *Id.*  As just noted, Kelco's methodology resulted in a corn value [[                ]]

the AUV of corn imported under the [[                        ]].  Yet Commerce did not know

what corn was actually imported under this heading.  *Id.*  And Commerce did not agree with

Kelco that the Thai Corn Standard proved that the "other corn" heading was for low-quality corn

that could not enter under the "human consumption" or "animal feed" headings:  It was not clear

to Commerce that there was any correlation whatsoever between the Thai Corn Standard and the

Thai tariff headings—much less one whereby the "human consumption" and "animal feed" tariff

headings were reserved for standard-certifiable corn and the "other corn" heading covered only

uncertifiable, lower quality remains.  *Id.*  As Commerce put it,

> Petitioner has not demonstrated that [[
>                                                                      ]] is reasonable or
> that there is a correlation between the [[
>                ]]. . . .
>
> [R]ecord evidence shows that the[] standard[ is] voluntary. There is also no record
> evidence on what type of corn is required to produce xanthan gum in Thailand, so
> the voluntary Thai standard[ is] not determinative and do[es] not support
> Petitioner's argument of using the[] standard[] as a basis for selecting the
> appropriate [surrogate value] for Fufeng's corn input.

*Id.* at 9–10.  Commerce accordingly disregarded the Thai Corn Standard and the weight-

averaging approach, instead continuing to value Fufeng's corn using the "animal feed" AUV.

## B.    Analysis

Kelco now claims that Commerce's decision to value Fufeng's corn using the "animal

feed" AUV was unsupported by substantial evidence.  Pl. Kelco's Br. 21–29.  Kelco makes two

arguments in support of this claim: (1) Commerce's selection of the "animal feed" AUV was

unreasonable because the [[

                ]], Pl. Kelco's Br. 21; *see id.* at 22–23, 27–29, and (2) Commerce's decision to

reject the Thai Corn Standard was unreasonable because Commerce's stated reasons for doing so

were inadequate, *id.* at 26–28.  Both arguments fail.

Kelco's first argument fails because Commerce selected the "animal feed" AUV

*precisely to account for* the low quality of Fufeng's corn, and Commerce's decision to do so was

reasonable.  Fufeng Final Determination Analysis Mem. at 9–10.  Put another way, Commerce

did not select the "animal feed" AUV because it mistakenly believed that Fufeng's corn was of

sufficient quality to be fed to animals; rather, Commerce selected the AUV because it matched

the low quality of Fufeng's corn.  *Id.*  This made sense, because the "animal feed" AUV, at

$0.114/kg, was the lowest of the three available AUVs.  Fufeng's Post-Prelim. Surrogate Values

at Ex. 1.  By valuing Fufeng's corn using the "animal feed" AUV, Commerce matched corn of

the lowest quality with the lowest available AUV.  This approach was reasonable, such that

Kelco's first argument fails.

Kelco's second argument—that Commerce's stated reasons for rejecting the Thai Corn

Standard were inadequate—also fails.  As already noted, Commerce rejected the Thai Corn

Standard because (1) it was not clear to Commerce that there was any correlation between the

Thai Corn Standard and the Thai tariff headings, (2) the Thai Corn Standard is voluntary, and (3)

there was no record evidence of the type of corn used to produce xanthan gum in Thailand.

Fufeng Final Determination Analysis Mem. at 9–10.  As to the first of these reasons, Kelco

argues that the correlation between the Thai Corn Standard and the Thai tariff headings should

have been clear to Commerce because the standard offered specific corn criteria where the

headings did not.  Pl. Kelco's Br. 27.  As to the second, Kelco argues that the standard's

voluntariness did not prevent it from being the "most relevant standard available" for choosing

between tariff-heading AUVs.  *Id.* at 26.  Finally, as to Commerce's third reason, Kelco argues

that information on *Thai* corn was irrelevant to Commerce's inquiry:  Commerce's task was to

determine the surrogate value of Fufeng's *Chinese* corn.  *Id.* at 27–28.

Kelco's second argument fails because even the first of Commerce's reasons for rejecting

the Thai Corn Standard, standing alone, was adequate to support Commerce's decision:  There

was no clear correlation between the Thai Corn Standard and the Thai tariff headings, and

therefore no reason to use the standard to decide which tariff-heading AUV applied to Fufeng's

corn.  According to Kelco, the Thai Corn Standard and the Thai tariff headings dovetailed in

such a way that the "other corn" heading was reserved for lowest quality corn like the [[

            ]].  Pl. Kelco's Br. 23–25; Kelco's Case Br. at 22–23.  Yet the "other corn"

AUV was $0.726/kg, nearly six-and-a-half times the "animal feed" AUV that Commerce

ultimately used to value Fufeng's corn.  Fufeng's Post-Prelim. Surrogate Values at Ex. 1.  If the

Thai Corn Standard in fact correlated with the tariff headings in the way that Fufeng claimed—

such that the "other corn" heading was reserved for lowest quality corn—then it is unclear why

the "other corn" AUV would be so high.  As such, there was no clear correlation between the

Thai Corn Standard and the Thai tariff headings.  Kelco's second substantial-evidence argument

therefore fails, and Commerce's decision to value Fufeng's corn using the "other corn" AUV

survives this court's review.[13]

## VI.   Commerce's Requests for Remand to Reconsider its Methodology for Allocating Energy at Fufeng's Neimenggu Facility Are Granted

        Both Fufeng and Kelco take issue with Commerce's methodology for allocating energy at

Fufeng's Neimenggu facility.  Fufeng's Neimenggu facility self-produced energy, such that

Commerce chose to value Neimenggu's energy inputs as factors of production to the extent that

Neimenggu used its energy for xanthan gum.  *See* Section D Resp. at 6.  Valuing the inputs was

complicated by the fact that Neimenggu self-produced two different kinds of energy, steam and

electric.  Commerce tried one methodology in its preliminary determination, but eventually

chose a different path in the final determination:  The agency (1) calculated the rate at which

Neimenggu consumed energy inputs in the production of all steam and electric energy (whether

used for xanthan gum or for other production), (2) calculated the rate at which Neimenggu

---

[13] Kelco also raises additional claims, in its reply brief only:  (1) Past practice and substantial evidence required Commerce to mimic the tariff-classification process when choosing which heading to use for valuing Fufeng's corn, and (2) past practice required Commerce to value Fufeng's corn input using a simple (not weighted) average of the available tariff headings.  Pl. Kelco's Reply Br. 16–17, 19–20.  Kelco failed to raise either claim any time before reply, so both are waived, neither exhausted.  28 U.S.C. § 2637(d); USCIT R. 81(l).

consumed steam and electric energy in the production of xanthan gum, and (3) multiplied the

rates from (1) and (2) together to calculate the rate at which Neimenggu consumed energy inputs

in the production of xanthan gum.  Fufeng Final Determination Analysis Mem. at 2–3.

Commerce valued the energy inputs according to the rate from (3).  *Id.*

      Both Fufeng and Kelco take issue with Commerce's calculation of the xanthan-gum

energy-consumption rate.  Pl. Fufeng's Br. 6–13; Pl. Kelco's Br. 8–10.  To calculate the rate,

Commerce divided the amount of energy used to produce Neimenggu's xanthan gum by the

amount of unfinished xanthan gum that Neimenggu produced.  In the numerator (energy used to

produce xanthan gum), Commerce included all of the energy consumed at Neimenggu's

cornstarch workshop, even though only some of Neimenggu's cornstarch was actually used in

xanthan-gum production.  This, according to Fufeng, was inaccurate.

      For its part, Kelco points out that Fufeng's Neimenggu facility manufactured both

finished and unfinished xanthan gum:  That is, Neimenggu did not finish all of the gum that it

started producing, but instead sent some xanthan gum to another facility (Shandong) for

finishing.  Kelco argues that Commerce therefore should have used the finished-gum amount as

the denominator for its xanthan-gum energy-consumption rate.  Pl. Kelco's Br. 8–10.

      In the alternative, Kelco raises a procedural claim.  Kelco argues that Commerce never

had the procedural chance to address its substantive grievance.  *Id.* at 10–11.  This is because

Commerce changed its methodology in the final determination, leaving Kelco without a chance

to brief the merits.  When Kelco tried to raise concerns through a 19 C.F.R. § 351.224(g)

ministerial-error submission, Commerce rejected the claim as a substantive grievance.  Thus,

according to Kelco, its first opportunity to fully debate Commerce's methodology was before

this court.  Kelco ventriloquizes concern for Commerce, arguing that the agency should have a chance to address its substantive argument before this court does.

Commerce requests voluntary remand to consider both claims, without presently admitting error as to either.  Gov't Resp. Br. 32–33; Def.'s Mot. for Partial Voluntary Remand, ECF No. 66.  Neither Kelco nor Fufeng object to the substantive grounds of the other's claim.  Pl. Fufeng's Reply Br. 1–2 ("Kelco did not address [our remand request] at all in its [r]esponse."); Def.-Intervenor Fufeng's Resp. Br. 5–6.  When Commerce requests remand to "reconsider its previous position" but does not admit error, whether to remand is in the court's discretion.  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  However, remand will generally be granted so long as Commerce has a "substantial and legitimate" concern.  The court holds that Commerce's concerns as to both claims are substantial and legitimate for the reasons set forth in Kelco's and Fufeng's briefing, respectively, and so remands each to Commerce for reconsideration.

On remand, Commerce should consider whether or not it was appropriate to include all of the energy consumed at Neimenggu's cornstarch workshop in the numerator of Neimenggu's xanthan-gum energy-consumption rate.  If so, Commerce should explain why.  Commerce should also consider whether or not it was appropriate to use the full amount of unfinished xanthan gum produced at Neimenggu as the denominator of Neimenggu's xanthan-gum energy-consumption rate and, if so, explain why.

## CONCLUSION AND ORDER

After carefully reviewing the parties' briefs and the administrative record, the court remands Commerce's selection of the Thai Ajinomoto financial statements over the Thai

Fermentation statements for further explanation by Commerce.  The court also remands

Commerce's energy allocation.  The court sustains Commerce's reasoning in all other respects.

Upon consideration of all papers and proceedings herein, it is hereby:

**ORDERED** that the final determination of the International Trade Administration, United States Department of Commerce ("Commerce"), published as *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33351 (Dep't Commerce June 4, 2013) (final determ.), as amended by *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 43,143 (Dep't Commerce July 19, 2013), be, and hereby is, REMANDED to Commerce for redetermination; it is further

**ORDERED** that Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record be, and hereby are, GRANTED as provided in this Opinion and Order; it is further

**ORDERED** that Commerce must issue a redetermination ("Remand Redetermination") in accordance with this Opinion and Order that is in all respects supported by substantial evidence, in accordance with law, and supported by adequate reasoning; it is further

**ORDERED** that Commerce shall reevaluate whether the Thai Ajinomoto or Thai Fermentation financial statements constitute the better source for surrogate financial ratios, explicitly comparing the imperfection in the Thai Ajinomoto statements (evidence of subsidies) with that in the Thai Fermentation statements (incompleteness), and shall recalculate the surrogate financial ratios consistent with this decision; it is further

**ORDERED** that Commerce shall reevaluate whether or not it was appropriate to include all of the energy consumed at the Neimenggu facility's cornstarch workshop in the numerator of Neimenggu's xanthan-gum energy-consumption rate, and shall recalculate Neimenggu's energy-input factor-of-production values consistent with this decision; it is further

**ORDERED** that Commerce must reevaluate whether or not it was appropriate to use the full amount of unfinished xanthan gum produced at the Neimenggu facility as the denominator of Neimenggu's xanthan-gum energy-consumption rate, and shall recalculate Neimenggu's energy-input factor-of-production values consistent with this decision; it is further

**ORDERED** that Commerce shall recalculate Fufeng's weighted-average dumping margins consistent with any recalculation of the surrogate financial ratios, and of Neimenggu's energy-input factor-of-production values; it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff and Defendant-Intervenor shall have thirty (30) days from the filing of the Remand Redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff and Defendant-Intervenor's comments to file comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: March 31, 2015
New York, New York